COMMONWEALTH of Kentucky, CAB-INET FOR HEALTH AND FAMILY SERVICES, and Larry Barnes, Appellants,

v.

Renee IVY (Now Knighten), Appellee.

No. 2010–SC–000527–DGE.

Supreme Court of Kentucky.

Oct. 27, 2011.

Lisa Frazier Osborne, Frankfort, KY, Deanna Wise Henschelm Assistant McCracken County Attorney, Paducah, KY, for appellant, Commonwealth Of Kentucky, Cabinet for Health and Family Services.

Karen Alderdice Paducah, KY, pro se.

Kathleen Kallaher Schmidt, Appeals Branch Manager, Frankfort, KY, for appellee.

Opinion of the Court by Justice ABRAMSON.

When Renee Ivy fell substantially behind in her child support payments, the Commonwealth's Cabinet for Health and Family Services (the Cabinet) moved the McCracken Family Court to hold her in contempt unless she could show cause for her failure to pay. At the hearing on the motion, Ivy presented evidence that her sole source of income is a federal benefit under the Supplemental Security Income program (SSI). That benefit, she argued, is not adequate to meet her own needs, much less her support obligation as well. The trial court reduced Ivy's support obligation from $106 to $60 per month, held her in contempt for having failed to pay the past due amount, and ordered that any future failure to pay the new amount plus $5 per month toward the arrears would result in her being placed in jail. Ivy appealed from that ruling and, in a split decision, a panel of the Court of Appeals reversed. The panel's majority held that neither the contempt finding nor the order to pay even reduced child support could stand in light of essentially uncontroverted evidence that Ivy does not have the ability to pay. We granted the Cabinet's motion for discretionary review to consider in what manner and to what extent SSI recipients may be held accountable for child support. We reverse the Court of Appeals' decision to the extent that it suggests that a SSI recipient-parent's present inability to pay precludes even the assessment of child support, but we vacate the existing order and remand for the family court to determine if the guidelines-based amount would be "unjust or inappropriate" pursuant to Kentucky Revised Statute (KRS) 403.211(2). Finally, we affirm the Court of Appeals holding that a contempt finding was inappropriate here where there was insufficient evidence that Ivy's failure to provide child support stemmed from any reason but her inability to do so.

## RELEVANT FACTS

Ivy's 2007 relationship with Larry Barnes, of Paducah, produced a child, D.G., who was born in February 2008. D.G. was the twenty-six-year-old Ivy's third child. Although the record on this point is not well-developed, it appears that Ivy suffers from a mental illness that impairs her ability to manage her affairs. For that reason, at least in part, custody of the two older children has been awarded to Ivy's sister and brother-in-law. For the same reason, again in part, Barnes was awarded sole custody of D.G., and Ivy was allowed only supervised visitation.

As noted, in May 2008, Ivy was ordered to pay $106 per month toward D.G.'s support. That amount was determined by applying the child-support table in KRS 403.212 to Ivy's and Barnes's combined monthly gross incomes, which included as Ivy's sole income her $637 per month SSI benefit. Ivy did not contest or appeal from that order. By virtue of assistance provided to D.G., in June 2008 the Cabinet became assignee for the support due him, and in February 2009 the Cabinet brought its motion for contempt. At that point, Ivy was some $850 in arrears, and by June of that year, when the motion was heard, the support arrearage had grown to almost $1125. By that time, Ivy had married and given birth to a fourth child.[1]

At the show cause hearing, Ivy presented the testimony of Kenneth Anderson, an attorney who serves in thirteen counties of

---

1. Ivy's married name is now Knighten. To avoid any confusion, however, we refer to her, as did the courts below, as Ivy.

western Kentucky as guardian and/or payee for SSI beneficiaries deemed by the Social Security Administration incapable of managing their SSI benefits. Ivy is one of Anderson's clients. Anderson explained that SSI benefits are awarded on the basis of need to individuals who are incapable of substantial employment because of age, blindness, or disability, and whose assets and income are otherwise minimal. Anderson testified that Ivy's award is paid each month into a trust account over which he has control and from which, after deducting a $37 administration fee, he pays Ivy's rent and utilities. If any funds remain—usually, Anderson testified, in the neighborhood of $25 to $50—he gives them to Ivy for clothing, personal care items, and other necessities. He explained that under Social Security Administration regulations he is required to use Ivy's award for her shelter, maintenance, and support, and he is thus precluded, in his view, from using the award to pay Ivy's child support. The cash he gives to Ivy, Anderson testified, is hers to do with as she sees fit, and it is Ivy's decision where to live. He was aware of Ivy's marriage, which had not affected her award.

Ivy testified that since the birth of her fourth child she had applied for housing assistance, but had not received a decision. Her husband, who worked only about half-time, she claimed, did not contribute to the rent or utilities, but did provide some support for their child. SSI, she testified, was her only source of income. She was not asked about her work history, and there is nothing else in the record to suggest that Ivy has ever held a job.

Toward the end of the hearing the trial court indicated that it would hold Ivy in contempt and order a $5 per month payment on the arrearage. At that point, Ivy moved to have her support obligation reduced. Granting that motion from the bench and reducing Ivy's support obligation to $60 per month, the court explained that it would not have set Ivy's support obligation as high as it originally ordered had it been aware that Ivy, as a client of Mr. Anderson, only had access to a small portion of her SSI award. It is apparently this change in the court's understanding of Ivy's circumstances that it refers to in its written order when it cites "a change of circumstances" as justifying the reduction in Ivy's support obligation. Neither in open court nor in its written order did the court explain how it arrived at the $60 per month figure.[2] In holding Ivy in contempt for having failed to pay the previously ordered child support, the family court found Ivy "to be an able-bodied person capable of providing financial support to her child." Again, neither at the hearing nor in its written order did the court indicate what evidence it relied on to reach that conclusion.

As noted, the Court of Appeals held that the record supported neither a finding of contempt nor the imposition of a support obligation, even a reduced one. The Social Security Administration's determination that not only was Ivy mentally disabled but so disabled as to be incapable of managing her award, the unrefuted proof that Ivy's only discretionary income was the $25 to $50 per month left over from her SSI benefit, and the trial court's own finding that Ivy's mental impairment significantly contributed to her unfitness to be D.G.'s custodian was compelling evidence, the Court of Appeals believed, that Ivy had been and would continue to be incapable of paying any child support. In light of that evidence, the Court of Appeals held the family court's unsupported findings

**2.** As noted below, the minimum amount of child support stated in KRS 403.212 for par-

ents with a combined income of $0 is $60 per month.

that Ivy was able-bodied and capable of providing support were clearly erroneous, and accordingly the family court had abused its discretion in both finding that Ivy's failure to pay her child support had been contemptuous and ordering her to pay support and arrears she did not have the ability to pay.

The Cabinet maintains that the Court of Appeals disregarded KRS 403.212, the child support guidelines; improperly presumed from Ivy's receipt of SSI benefits that she is incapable of working; and failed to defer to the family court as the finder of fact.[3] There is some merit to the Cabinet's contentions, but before addressing them our analysis must begin with an attempt to clarify the trial court's order, which combined a contempt ruling with a ruling reducing Ivy's support obligation. Although related, the two rulings involve different standards, and those standards should be distinguished.

### ANALYSIS

I. **Ivy's Guidelines–Determined Support Obligation May Be Reduced If Properly Determined To Be Unjust or Inappropriate.**

◼ Turning first to that part of the family court's order reducing Ivy's support obligation, we note that under KRS 403.211 and 403.212, child support is to be determined by applying the guidelines to the parents' combined, adjusted gross incomes. The guidelines provide a statutory child support obligation—the "table amount," not less than sixty dollars ($60) per month—and that obligation is then divided between the parents in proportion to their gross incomes. KRS 403.212(3). Under KRS 403.212(2)(b), "gross income"

is defined to include Supplemental Security Income. Pursuant to these provisions, in April 2008, Ivy and Barnes were found to have a combined monthly income of $2489.50, including Ivy's SSI benefit of $637.00. That income yielded a guidelines support obligation of $411.74, which was apportioned $305.74 to Barnes and $106.00 to Ivy.

Under KRS 403.211(2), this guidelines-determined result enjoys a presumption of correctness. Given that presumption, there are only two ways in which Ivy's support obligation could deviate from the guidelines-determined $106 per month. First, under KRS 403.213, a "substantial and continuing change" in the parties' incomes, expenses, or other material circumstances could necessitate a recalculation of their support obligations under the guidelines. Alternatively, KRS 403.211(2) permits the court to deviate from the guidelines "where their application would be unjust or inappropriate." The family court invoked neither of these statutes, and it is not immediately clear from its ruling which route it meant to take.

On the one hand, the reference in its order to "a change of circumstances," suggests that the family court had KRS 403.213 in mind. If so, however, it failed to identify the circumstances that had changed and failed to show how the guidelines as applied to the new circumstances resulted in a reduction of Ivy's obligation to $60 per month. In particular, the family court did not find that Ivy's adjusted gross income had changed or had initially been miscalculated. Indeed, as noted, KRS 403.212 defines "gross income" as including SSI benefits and does not distin-

---

**3.** The Cabinet also requests this Court to take judicial notice of a certified "Payment Ledger" which shows Ivy has paid the $60 per month child support amount and $5 toward arrears for the almost two years following the entry of the family court's order and preceding the filing of the Cabinet's reply brief. That request is addressed below.

guish between benefits paid directly to the beneficiary and benefits paid through a payee such as Mr. Anderson. Ivy's gross income, therefore, includes the full amount of her benefit, however paid, and it thus appears that, as far as the guidelines are concerned, her $106 per month obligation was correctly determined.

This suggests that, despite the reference to "changed circumstances," the family court meant to invoke KRS 403.211(2) and to deviate from the guidelines because, with its new understanding of Ivy's circumstances, it deemed application of the guidelines "unjust or inappropriate." The court's surprise at learning of Mr. Anderson's role and of the fact that Ivy has direct access to only a small portion of her SSI benefit confirms this impression. It was apparently the family court's sense that it would be unjust to apply the guidelines where, whatever Ivy's income under the guidelines, her actual, discretionary income was a small fraction of that amount, was inadequate for her own needs, and was not even half of her guidelines-determined child support obligation. The court went on to rule, however, that while $106 per month was too great an obligation, $60 per month was appropriate because Ivy "is able-bodied and capable of providing support." As noted, the court did not indicate the evidence upon which it relied to reach these last conclusions, nor did it explain how it arrived at the $60 per month figure.

Although the Court of Appeals did not discuss the statutory underpinnings of the family court's order, it essentially upheld that court's decision to deviate from the guidelines, but reversed because in its view the family court had not deviated enough. The Cabinet attacks both aspects of the Court of Appeals' decision. It argues, first, that by deviating from the guidelines the Court of Appeals (and by implication the family court as well) effec-

tively excluded from Ivy's income the SSI benefits which the General Assembly has expressly stated should be included. It also argues, alternatively, that in rejecting the amount of the family court's deviation, the Court of Appeals erroneously gave preclusive effect to the Social Security Administration's determination that Ivy is disabled and otherwise improperly substituted its view of the facts for that of the family court.

In general, of course, the family court enjoys broad discretion "in the establishment, enforcement, and modification of child support." *Artrip v. Noe,* 311 S.W.3d 229, 232 (Ky.2010). We review its decisions, accordingly, as does the Court of Appeals, only for abuse of that discretion. *Id.* While that discretion extends, pursuant to KRS 403.211(2)–(4), to deviations from guidelines-determined child support amounts, the family court may not, under the guise of deviation, disregard or modify the intentions of the General Assembly as expressed in the child support statutes. *Keplinger v. Keplinger,* 839 S.W.2d 566 (Ky.App.1992). The Cabinet maintains that the deviation effected in this case by the family court and by the Court of Appeals runs afoul of this principle.

To understand the Cabinet's position, it is necessary to recall that prior to 1994, SSI benefits, like other means-tested welfare benefits, were expressly excluded from Kentucky's (and most other states') statutory definition of a parent's "gross income," and thus had no bearing on the determination of child support. In 1994, however, the entire country was deeply concerned with welfare reform and particularly with the link between welfare and child support. *See* Drew A. Swank, *The National Child Non–Support Epidemic,* 2003 Mich. St. DCL L.Rev. 357 (2003); Angela F. Epps, *To Pay Or Not To Pay, That Is The Question: Should SSI Recipi-*

*ents Be Exempt From Child Support Obligations?* 34 Rutgers L.J. 63 (2002). At that time, our General Assembly amended the KRS 403.212 definition of "gross income" to include rather than to exclude SSI benefits. In the same legislation—HB 472 (1994)—the General Assembly amended the child-support guidelines so as to provide for a minimum support obligation of $60 per couple, even when the parents' combined income is zero. These amendments contemplate that child support may be ordered and may accrue even against a parent with no present ability to pay.

This legislation is powerfully symbolic, of course, underscoring the duty of every parent to provide support for his or her children. By making a support obligation possible for virtually all parents, moreover, the General Assembly may have hoped to provide some incentive against what has been referred to as "procreation out of control," the unrestrained having of children in the belief that someone else, the state if need be, will support them. Epps, *To Pay Or Not To Pay* at 80. But beyond its symbolism, the legislation recognizes that present circumstances need not be permanent, that disabled parents may improve physically or mentally, that unemployed parents frequently find jobs, and that parents without resources frequently acquire them. If and when they do, the General Assembly has decided, it is not unjust that they be required to repay some of the child support others, often times taxpayers, have provided for them.

Given this apparent legislative intent to allow the accrual of child support in some amount regardless of the parent's present ability to pay, and given the General Assembly's express inclusion of SSI benefits in the income from which the support obligation is to be calculated, the Cabinet argues that Ivy's guidelines-determined support obligation is appropriate and should be permitted to accrue against her at the guidelines rate notwithstanding her inability to pay it. The trial court and the Court of Appeals erred, according to the Cabinet, by failing to distinguish between the accrual of child support, on the one hand, and its collection, on the other, and by incorrectly basing a deviation from her support obligation—an accrual question—on her ability to pay—a question bearing only on collection.

Although we agree with the Cabinet that the support statutes evince a strong legislative determination that parents be held accountable for the support of their children and that the guidelines authorize support orders even against parents presently unable to meet them, we do not agree that the General Assembly intended to mandate such orders in all cases or to limit what has long been the trial and family courts' broad discretion to deviate from the guidelines where their strict application would be "unjust or inappropriate" as provided in KRS 403.211(2). While the 1994 amendments to the support statutes sharpened the distinction between the accrual of child support and its collection, we are not persuaded that the General Assembly meant to divorce those concepts or to preclude the trial courts from determining that the accrual of child support and not merely its collection is unjust or inappropriate in a given case. The accrual of child support, after all, can have serious consequences, not the least of which is the possibility of criminal prosecution. Trial courts need not be blind to that fact. Moreover, it bears noting that the 1994 legislation left the deviation statute—KRS 403.211(2)—intact, and that statute is as meaningful as any other section of the child support statutes. The purpose of that grant of authority is to allow a trial court to do justice when the guidelines-determined amount just does not work. The guidelines

amount, after all, is just that—a guideline—not an amount graven in stone.

On the other hand, while KRS 403.211(2) authorizes the trial court to deviate from the guidelines amount, the court should not do so without good reasons, and those reasons should be sensitive to the General Assembly's abiding concern that parents· be held accountable for the support of their children. The court, moreover, should be able to articulate its reasons both for rejecting the guidelines amount and for imposing some particular alternative amount. Here, the family court clearly deemed it unjust for support arrears to accrue against Ivy at a rate far in excess of what she could hope to afford from the small residue of her SSI payment left to her each month. We agree with the Court of Appeals that a deviation from the guidelines on this ground was not an abuse of the family court's discretion.

The family court went on to rule, however, that, while the guidelines amount of $106 per month was too much, the lesser amount of $60 per month was just and appropriate. The Court of Appeals disagreed. As the panel's majority saw it, Ivy's very limited means left her no more able to afford $60 per month than $106, and accordingly it ruled that Ivy's support obligation should be extinguished altogether. The Cabinet contends that by so ruling the Court of Appeals usurped the family court's role as the finder or fact and failed to give deference to the family court's discretion.

Notably, the family court provided little, if any, rationale for the $60 figure. It may well be that the family court meant to impose what it regarded as the minimum amount the child support statutes allow.[4] Any such statutory minimum, however, like any other guidelines amount, is only presumptively appropriate and is subject to deviation under KRS 403.211(2). If we assume that the family court meant to invoke a supposed minimum, its order does not give assurance that it recognized its authority to deviate from that minimum, and thus it is not clear that it based its order on the proper standard.

In fact, the family court said nothing about a statutory minimum. That court simply said that Ivy "is able bodied and capable of providing support." It meant, apparently, both that Ivy had been capable of providing support, thus making her past failure to do so contemptuous, and that she would continue to be capable, thus justifying a continuing, albeit reduced, support obligation. The Court of Appeals rejected both findings, which it believed had no evidentiary support. The Cabinet maintains that the Court of Appeals has merely, and improperly, substituted its view of the evidence for that of the family court. While the family court made no reference to any evidence whatsoever, the Cabinet insists that the "record," very broadly construed, adequately supports the family court's rulings and thus that those rulings should be upheld. With respect to the family court's contempt ruling, we reject the Cabinet's position as we explain in detail below. With respect to the family court's $60 per month prospective modification of Ivy's support obligation, rather than parsing a spare record and attempting to divine from it what may have led the family court to rule as it did, particularly since circumstances are very likely to have

---

4. As noted above, KRS 403.212(4) provides that "[t]he minimum amount of child support shall be sixty (60) dollars per month." Does this mean $60 per couple or $60 per parent? The issue is not before us so we need not decide, but we may note that the inclusion in the guidelines table of a $60 minimum amount suggests, at least, a per-couple reading.

changed, we deem it best simply to vacate the modified award and to remand the matter to that court for reconsideration and findings under the standards discussed in this Opinion.

## II. Ivy's Inability to Pay Her Child Support Precluded Holding Her In Contempt For Failing to Do So.

As discussed above, under the General Assembly's current approach to child support, in certain circumstances support may be ordered and may accrue against an obligor parent even if that parent does not presently have the ability to pay. The $60 minimum support amount, for example, may need to be apportioned, in whole or in part, to a parent with no means to pay it. As this case demonstrates, the General Assembly's inclusion of SSI benefits in the "income" that may be looked to for support can also result in an award against an impecunious parent. The accrual of a support obligation, therefore, does not depend, at least not entirely, on the obligor parent's ability to pay. The obligor's ability to pay, however, does determine the extent to which support can be collected. Where there is no ability to pay, it is not contumacious to fail to do so. Here, the family court found Ivy in contempt for having failed to pay the support previously ordered. We agree with the Court of Appeals that that finding was in error.

A trial court, of course, has broad authority to enforce its orders, and contempt proceedings are part of that authority. *Lewis v. Lewis*, 875 S.W.2d 862 (Ky.1993). KRS 403.240, moreover, provides that a party's noncompliance with a support or custody decree "shall constitute contempt of court," and shall be addressed as such. We review the trial court's exercise of its contempt powers for abuse of discretion, *Lewis*, 875 S.W.2d at 864, but we apply the clear error standard to the underlying findings of fact. *Blakeman v. Schneider*, 864 S.W.2d 903 (Ky.1993).

Contempt sanctions are classified as either criminal or civil depending on whether they are meant to punish the contemner's noncompliance with the court's order and to vindicate the court's authority and dignity, or are meant to benefit an adverse party either by coercing compliance with the order or by compensating for losses the noncompliance occasioned. *Gormley v. Judicial Conduct Commission*, 332 S.W.3d 717, 725–26 (Ky. 2010). Since this proceeding was meant to coerce Ivy's compliance with her child-support obligation and not to punish her, it was civil in nature.

In a civil contempt proceeding, the initial burden is on the party seeking sanctions to show by clear and convincing evidence that the alleged contemnor has violated a valid court order. *See, e.g., Roper v. Roper*, 242 Ky. 658, 47 S.W.2d 517 (1932). If the party is seeking compensation, it must also prove the amount. Once the moving party makes out a prima facie case, a presumption of contempt arises, and the burden of production shifts to the alleged contemnor to show, clearly and convincingly, that he or she was unable to comply with the court's order or was, for some other reason, justified in not complying. *Clay v. Winn*, 434 S.W.2d 650 (Ky. 1968). This burden is a heavy one and is not satisfied by mere assertions of inability. *Dalton v. Dalton*, 367 S.W.2d 840 (Ky. 1963). The alleged contemnor must offer evidence tending to show clearly that he or she made all reasonable efforts to comply. *Id.* If the alleged contemnor makes a sufficient showing, then the presumption of contempt dissolves and the trial court must make its determination from the totality of the evidence, with the ultimate burden of persuasion on the movant.

There was no dispute here concerning the Cabinet's prima facie case. Ivy contested neither the validity of the family court's child-support order nor the amount of her arrears. The burden was hers, therefore, to show that she had been unable to comply. In many cases, perhaps, a showing sufficient to *permit* a finding that the alleged contemnor was unable to comply will essentially *compel* such a finding. Here, however, while Ivy's proof that she was and had been disabled and needy by Social Security Administration standards permitted a finding of inability, we agree with the Cabinet that the receipt of SSI benefits, standing alone, does not compel such a finding. Several courts have held or observed that the receipt of SSI benefits does not preclude the enforcement of a child support obligation where there is evidence that the obligor retains or has regained the ability to earn income from which child support could be paid. *Larizza v. Larizza,* 286 Ga. 461, 689 S.E.2d 306 (2010); *Burns v. Edwards,* 367 N.J.Super. 29, 842 A.2d 186 (2004); *Hurd v. Hurd,* 303 A.D.2d 928, 757 N.Y.S.2d 170 (2003); *Lee v. Lee,* 859 So.2d 408 (Miss.App.2003). At least two courts, moreover, have held that SSI benefits themselves may support a finding that the recipient has the ability to pay child support, provided that the evidence clearly establishes that payment of the support would not deprive the recipient of the means to live. *Whitmore v. Kenney,* 426 Pa.Super. 233, 626 A.2d 1180 (1993) (disabled mother admitted at hearing that she could afford from her SSI award $80 per month for child support); *Ex parte Griggs,* 435 So.2d 103 (Ala.Civ. App.1983) (although SSI benefits not exempt, where payment of child support would have left the SSI recipient with only $160 per month on which to live, it was an abuse of discretion to hold him in contempt for failing to pay).

The family court is not free, of course, simply to disregard the Social Security Administration's determinations that an SSI recipient is disabled and needs the full amount of his or her award for subsistence. If earning capacity is to be attributed to the recipient, or if child support is to be demanded from the SSI benefit itself, there must be evidence clearly establishing the recipient's ability to work or the recipient's ability to afford the support payment. We agree with the Court of Appeals that there was no such evidence here.

With respect to her SSI benefit itself, Ivy's evidence was that, apparently from the outset of the support order, the benefit had barely afforded her shelter. The $25 to $50 left to her each month, even with food stamps, was a meager provision for clothing and personal care items, and came nowhere near enabling her to afford her $106 support obligation. Ivy, it is true, was obliged to make every reasonable effort to comply with the order of support, but apparently she did make sporadic payments, and on this record it cannot be said that she should have done more. In particular, her housing expense was not shown to have been so out of line as to be deemed a breach of her obligation.[5] Ivy's SSI income, therefore, was not shown to give Ivy the ability to comply with the support order, and to that extent the family court abused its discretion by deeming her failure to pay contemptuous.

The family court's contempt finding, however, was not based so much on Ivy's

---

5. The Cabinet notes that Ivy, through Mr. Anderson, was paying the rent and utility bills even though her new husband was employed and lived in the residence with her. Without additional evidence of the couple's circumstances, this fact alone did not render Ivy's payment of these expenses unreasonable.

failure to eke out a support payment from her SSI benefit. The court found, rather, that Ivy is "able-bodied and capable of providing support," and thus apparently meant to impute to her, during the period prior to the hearing, the capacity to earn enough to pay at least some of the support she owed.[6] The court made no findings in support of this conclusion, as it should have done, and indeed made no reference to any evidence at all. Because the court failed to make findings of fact, our review is essentially for abuse of discretion.

The Cabinet insists that the family court's ruling should be upheld because at other hearings in this matter Ivy admitted that she could drive a car and could mow the lawn, and because the court had had many opportunities to observe Ivy in the courtroom and in that way could assess her abilities. We agree with the Court of Appeals, however, that these facts, even if properly considered by the family court, are not sufficient to impute income to Ivy in the face of the Social Security Administration's determination that she is mentally disabled, disabled in a way and to a degree that renders her not only incapable of meaningful employment, in the Administration's view, but incapable as well of managing her SSI benefits.

While the family court's courtroom observations are not meaningless, they cannot be the sole basis for the court's assessment of Ivy's mental condition, an assessment requiring specialized training. Moreover, the court itself found Ivy's mental impairment serious enough to affect her fitness as a custodian of her child. Ivy's apparent good physical health, furthermore, and her ability to drive are not directly enough related to employment to alone support the family court's ruling. For a court to impute earning capacity to an SSI recipient, whether *post hoc*, in the contempt context, or prospectively in the assessment of a support award, in addition to the usual evidence of job skills, job history, and job availability, if any, there must be evidence that addresses the recipient's disability. For example, there may be evidence that the disability has abated, that work exists which could accommodate it, or that despite a disability the recipient has in fact held a job. *See Hurd v. Hurd*, 757 N.Y.S.2d at 170 (upholding imputation of income to SSI recipient where doctor's report and recipient's own testimony made clear that the recipient's medical condition did not foreclose non-strenuous employment). Absent some such evidence, which, of course, should be reflected in the court's express findings, the family court is not free simply to disregard the SSA's determination. Here there was no such evidence, and so the family court abused its discretion by deeming Ivy's failure to earn support monies contemptuous.

Having found a party in contempt, the court's next task is to fashion a remedy. Where, as here, the contempt proceeding is civil, the sanction may serve either to coerce the contemnor to comply with a court order, to compensate a party for losses caused by the contempt, or both. *United States v. United Mine Workers of America*, 330 U.S. 258, 67 S.Ct. 677, 91 L.Ed. 884 (1947). Coercive sanctions, such as daily fines or incarceration, are punishments imposed until the contempt is purged by compliance with an order. For the punishment to retain its civil character, the contemnor must, at the time the sanction is imposed, have the ability to purge

6. As noted below, SSI recipients can earn a modest amount of income without jeopardizing their benefits.

the contempt by compliance and either avert the punishment or at any time bring it to an end. *Shillitani v. United States,* 384 U.S. 364, 86 S.Ct. 1531, 16 L.Ed.2d 622 (1966); *Lewis v. Lewis,* 875 S.W.2d at 862. The contemnor bears the burden of proving his or her inability to meet the purge condition, but in imposing that burden the court should be mindful of the contemnor's overriding interest in not being required to perform an impossible act. *Lewis,* 875 S.W.2d at 864. The court has broad discretion to fashion compensatory remedies, but they must be based on evidence of actual loss. *United Mine Workers.*

Here, in addition to modifying the amount of Ivy's support obligation, the family court found Ivy in contempt for having violated the support order, sentenced her to serve thirty days in the McCracken County jail, but stayed execution of that sentence on condition that Ivy "pay her monthly child support obligation of $60.00, as it becomes due, plus pay her arrears as follows: pay $5.00 per month until the arrears are paid in full." Had the court properly found Ivy in contempt, it could, as a compensatory remedy, have ordered her to make payments toward her arrears in an amount she could afford. The court also could have ordered her imprisonment for past non-compliance. *Lewis,* 875 S.W.2d at 864. The court's attempt to fashion a coercive remedy, however, by threatening Ivy with *fixture* incarceration for *future* violations of her support order, did not provide her with a true opportunity for purging, and thus was invalid.[7] As noted above, the purge condition of a coercive order must be something presently within the contemnor's ability to perform. Ivy had no present ability to perform future obligations. By itself, moreover, a future failure to pay would not, in and of itself, the court's order notwithstanding, justify Ivy's incarceration. That future conduct was not, and could not be, the subject of the pending contempt motion because it had yet to occur. If Ivy did fail to pay, she would be entitled to notice, a new hearing, and a finding that at that future point in time she had the ability to comply. See, *e.g., Tucker v. Tucker,* 10 Ohio App.3d 251, 461 N.E.2d 1337 (1983). Even were it valid, therefore, the court's order would amount to little more than a reaffirmation of the support order.

 Against this conclusion, the Cabinet seeks to establish the propriety of the family court's order in this case, in part, by reference to a Payment Ledger allegedly reflecting Ivy's success in meeting her child support payments after the entry of the order under review. The Cabinet argues that this Payment Ledger, which is not in the record on appeal, proves the family court was correct in its determination that Ivy had the ability to pay. Accordingly, the Cabinet requests this Court to take judicial notice of the Payment Ledger pursuant to Kentucky Rule of Evidence (KRE) 201. While judicial notice may be taken at any stage of the proceedings, KRE 201(f), it is to be used "cautiously" by appellate courts. *Doe v. Golden & Walters, PLLC,* 173 S.W.3d 260, 264–65 (Ky.App.2005). Judicial notice is not appropriate in this instance because the Payment Ledger relates to facts occurring after the contempt hearing and entry of the family court's order. As explained above, a trial court must determine wheth-

---

7. Although a determinate sentence, such as the thirty-day sentence here, might suggest that the court intended a criminal sanction, that suggestion is belied by the clearly civil nature of the proceedings. For a discussion of civil and criminal contempt and the more exacting requirements for "serious" offenses see *Miller v. Vettiner,* 481 S.W.2d 32, 34–35 (Ky.1972).

er contempt sanctions are justified on the evidence before it and then make findings supporting its ruling, a ruling which will be reviewed for an abuse of discretion. Assessing the propriety of that order based on subsequent events is simply not the function, or even prerogative, of an appellate court. Consequently, we decline to take the requested judicial notice. We further note that making child support payments after a family court's contempt order does not necessarily establish an ability to meet those support payments for the time frame at issue in the contempt hearing. In this case, while it is not inconceivable that Ivy obtained a part-time job or received a higher SSI payment, it seems much more likely that obtaining the public housing for which she had been waiting or receiving assistance from her husband in paying the couple's rent and utility bills would explain her newfound compliance with her support obligation. It is also possible that family members who had custody of Ivy's other children stepped up to assist her in some way. In short, even if it were proper to take judicial notice of the Payment Ledger, the facts reflected do not necessarily have any bearing on Ivy's ability to pay for the period at issue in the contempt hearing.

Finally, we acknowledge the family court and the Cabinet's frustration with a parent who has chosen to have children despite her very limited ability and, it might seem, her very limited willingness to provide for them. It is a frustration shared by welfare agencies and family courts in every state. Although we agree with the Court of Appeals that in this case the family court's contempt finding was not adequately supported by evidence countering Ivy's proof of disability, and though we disapprove of the family court's attempt to make a future violation of the support order the trigger for contempt sanctions, our rulings are not meant to discourage creative approaches to the problem of non-support. Addressing that problem in a case similar to this one, the Court of Appeals of Maryland has observed that, while punitive sanctions may ultimately be warranted, civil contempt proceedings are not meant to punish, but, in this context at least, to bring about some degree of rehabilitation which may take many forms:

If the court desires to proceed with the civil contempt but, due to the defendant's current inability to meet any meaningful purge, is precluded from imposing a sanction of incarceration, it should explore the reasons why the defendant is impecunious and attempt to deal with that situation. Usually, as here, the problem is lack of steady employment, which may, in turn, be occasioned by a variety of circumstances: mere indolence or willful defiance (voluntary impoverishment), physical, mental, or emotional disability, lack of general or specialized education, lack of a diploma, degree, certificate, or license of some kind that the defendant, with some reasonable effort and time, may be capable of obtaining, or a disabling addiction. If unemployment is the problem, the court, upon determining the cause, may ... enter reasonable and specific directives to deal with it. The court may order the defendant to pursue employment opportunities in a specific manner. It may order the defendant to pursue necessary education or a diploma, degree, certificate, or license that may be necessary or helpful in making the defendant eligible for meaningful employment. It may direct the defendant to seek a form of treatment for health or addiction problems that has a reasonable chance of dealing with the problem sufficiently to qualify the defendant for meaningful employment. In all instanc-

es, the directives must be specific and they must be reasonable. The programs must be available and affordable to the defendant, and they must be relevant to the objective. The court may order the defendant to report periodically, and it may monitor compliance. It may modify the requirements as circumstances warrant. If it appears that the defendant is willfully not complying with the directives, the court may cause criminal contempt proceeding to be filed, aimed at punishing defiance of the directives. If, as a result of that defiance, the underlying support order remains in arrears, the State's Attorney, if so inclined, may pursue a criminal action. *Arrington v. Department of Human Resources,* 402 Md. 79, 935 A.2d 432, 448–49 (2007). The trial court is not obliged to pursue such measures, of course, and any such measure must follow a valid finding of contempt, but we agree with the Maryland Court's observation that, even in cases where the contemnor's circumstances are so impoverished as to preclude the present collection of support arrears, the trial court is not without options in fashioning a meaningful contempt order.

### III. Neither the Assessment of Child Support nor a Proceeding to Collect It Violates Federal Law.

■ We turn now to Ivy's contention that the Court of Appeals' ruling should be upheld because, as an SSI recipient, she ought not to have been subjected to contempt proceedings at all, *i.e.,* federal law pertaining to SSI benefits preempts any child support collection effort under state law. This contention was not raised in the trial court and was not addressed by the Court of Appeals, but given the issue's constitutional implications and its obvious bearing on the issues we have already addressed, and given the fact that it raises only questions of law, we believe it incum-

bent upon us to address this issue as well. *Burton v. Foster Wheeler Corp.,* 72 S.W.3d 925 (Ky.2002).

As noted above, prior to July 1994, KRS 403.212 excluded SSI benefits from the definition of "gross income" for child support purposes, and so rendered those benefits exempt from consideration as child support. Child support statutes in a large majority of other states continue to exempt SSI benefits, and in several others SSI benefits have been exempted by judicial decision. *Davis v. Office of Child Support Enforcement,* 341 Ark. 349, 20 S.W.3d 273 (2000) (counting thirty-eight states exempting SSI benefits from child support and joining that majority). Ivy maintains that the exemption is required by the federal laws creating the SSI program and by the Supremacy Clause of the United States Constitution, which gives those laws preclusive effect in the states. We considered and rejected this argument, at least in part, in *Commonwealth ex rel. Morris v. Morris,* 984 S.W.2d 840 (Ky.1998).

In that case, a Supremacy Clause attack on the 1994 amendment to KRS 403.212, which, as noted, changed the definition of "gross income" so as to include SSI benefits, we acknowledged that the purpose of the SSI program is to assist persons of minimal means "who cannot work because of age, blindness, or disability." *Morris,* 984 S.W.2d at 841 (quoting from *Schweiker v. Wilson,* 450 U.S. 221, 223, 101 S.Ct. 1074, 67 L.Ed.2d 186 (1981)). We also acknowledged that Congress has made the SSI program subject to 42 U.S.C. § 407(a), which provides that

[t]he right of any person to any future payment under this subchapter shall not be transferable or assignable, at law or in equity, and none of the moneys paid or payable or rights existing under this subchapter shall be subject to execution, levy, attachment, garnishment, or other

legal process, or to the operation of any bankruptcy or insolvency law.

To understand the scope of that provision, we looked to 42 U.S.C. § 659, where "legal process" is defined as

> any writ, order, summons, or other similar process in the nature of garnishment, which—(1) is issued by (A) a court of competent jurisdiction in any State, territory, or possession of the United States ... and (2) is directed to, and the purpose of which is to compel, a government entity which holds moneys which are otherwise payable to an individual to make a payment from the moneys to another party in order to satisfy a legal obligation of the individual to provide child support or make alimony payments.

42 U.S.C. § 659(i). Since merely assessing child-support could not be deemed an attempt "to compel ... a government entity ... to make payment," we held that KRS 403.212's inclusion of SSI benefits in the definition of "gross income" and its use of them in the calculation of the recipient's support obligation was not addressed by section 407, and was not precluded by federal law.

*Morris* allowed the assessment of child support against an SSI recipient pursuant to KRS 403.212, but it expressly left open the question whether an SSI recipient could be subjected to a support enforcement action such as the contempt proceeding here. Ivy maintains that the language in section 407(a) shielding her SSI benefits from garnishment-like "legal process" extends to enforcement actions, and thus that the contempt proceeding against her was improper.

The United States Supreme Court addressed a similar claim in *Rose v. Rose,* 481 U.S. 619, 107 S.Ct. 2029, 95 L.Ed.2d 599 (1987), in which it held that a provision analogous to section 407(a)—38 U.S.C. § 3101(a)—shielding veterans' disability benefits from "attachment, levy, or seizure" did not shield a veteran-recipient from a state court contempt action to compel child support. The *Rose* Court initially addressed the general principles regarding preemption of state family law by federal law pursuant to the Supremacy Clause:

> We have consistently recognized that [t]he whole subject of the domestic relations of husband and wife, parent and child, belongs to the laws of the States and not to the laws of the United States. On the rare occasion when state family law has come into conflict with a federal statute, this Court has limited review under the Supremacy Clause to a determination whether Congress has positively required by direct enactment that state law be preempted. Before a state law governing domestic relations will be overridden, *it must do major damage to clear and substantial federal interests.*

481 U.S. at 625, 107 S.Ct. 2029 (emphasis supplied; citations and internal quotation marks omitted).

Looking at the legislative history of 38 U.S.C. § 3101(a), the Rose Court explained that the anti-attachment provision served two purposes:

> to avoid the possibility of the Veterans' Administration being placed in the position of a collection agency, and to prevent the deprivation and depletion of the means of subsistence of veterans dependent upon these benefits as the main source of their income.

481 U.S. at 630, 107 S.Ct. 2029 (citations and internal quotation marks omitted). The contempt proceeding constrained neither purpose, the Court ruled, since the Administrator "was not obliged to participate in the proceeding or to pay benefits directly to appellee," *id.,* and since the state court's exercise of jurisdiction over

the recipient's benefits did not "deprive appellant of his means of subsistence contrary to Congress' intent, for these benefits are not provided to support appellant alone." *Id.* Rather, the Court noted, again looking to the legislative history, "[v]eterans' disability benefits compensate for impaired earning capacity ... and are intended to provide reasonable and adequate compensation for disabled veterans *and their families.*" 481 U.S. at 630, 107 S.Ct. 2029 (emphasis in original, citations and internal quotation marks omitted).

Here, too, the contempt proceeding against Ivy cannot be thought to conflict with section 407(a) to the extent that the statute is meant to prevent use of the SSA as a "collection agency," since the agency was not made a participant and is not being asked to pay funds directly to the Cabinet. Whether, however, in line with *Rose,* Ivy's benefits, as opposed to the administrator of those benefits, are subject to the trial court's jurisdiction is a much harder question.

Ivy says "no," of course, but we reject her principal reason for saying so. She maintains that an intent to exempt those benefits can be inferred from the fact that SSI benefits are not covered by 42 U.S.C. § 659(a). That statute, a provision of the Child Support Enforcement Act, overrides section 407(a) and permits the garnishment, for child-support purposes, of benefits "the entitlement to which is based upon remuneration for employment." Because an award of SSI benefits is not based on remuneration for employment, section 659(a) does not apply to those benefits and they remain subject to section 407(a)'s anti-attachment provisions even when child support is at issue. Ivy contends that the fact that section 659(a) does not apply to SSI benefits indicates that even for child support purposes the benefits themselves are not subject to any form

of legal process including a contempt proceeding. We disagree.

Like SSI benefits, the veterans' disability benefits at issue in *Rose* are not covered by section 659(a), but that fact did not, the Supreme Court held, imply that they may not be the object of an enforcement action against a child-support obligor. Section 659(a), the Court explained,

> was intended to create a limited waiver of sovereign immunity so that state courts could issue valid orders directed against agencies of the United States Government attaching funds in the possession of those agencies.... Waivers of sovereign immunity are strictly construed, and we find no indication in the statute that a state-court order of contempt issued against *an individual* is precluded where the individual's income happens to be composed of veterans' disability benefits. In this context, the Veterans' Administration is not made a party to the action, and the state court issues no order directing the Administrator to pay benefits to anyone other than the veteran. Thus, while it may be true that these funds are exempt from garnishment or attachment while in the hands of the Administrator, we are not persuaded that once these funds are delivered to the veteran a state court cannot require that veteran to use them to satisfy an order of child support.

481 U.S. at 635, 107 S.Ct. 2029.

Similarly, although section 659(a) leaves SSI benefits exempt from garnishment or attachment while in the hands of the administrator, that fact does not establish their exemption in the hands of a recipient liable for child support. Of course, to say that section 659(a) does not rule out an enforcement action is not to say that such an action is ruled in. Under *Rose,* the question remains whether such an action would "deprive [the SSI recipient] of his

means of subsistence contrary to Congress' intent."[8] 481 U.S. at 630, 107 S.Ct. 2029.

We are persuaded that that question cannot and need not be answered in a categorical manner, but must be addressed case-by-case. This is so, we believe, because the interests at stake—the recipient parent's interest in an income sufficient to meet life's most basic demands and the recipient's child's interest not just in basic support but in support from his or her parent—are both of such compelling importance that neither justifies disregarding the other. Clearly, as many courts and commentators have observed, the SSI program is principally addressed to assuring subsistence to some of society's most vulnerable members, those whose age, blindness, or disability makes them incapable of substantial gainful activity and whose resources are otherwise negligible. For many such persons, the federal benefit is all that stands between them and destitution and it extends no further than their own most basic needs. Parents in this plight, notwithstanding their fundamental duty to support their children, are incapable of providing that support and may not be sanctioned for failing to do so.

As the statutes and regulations governing the SSI program recognize, however, not all persons eligible for benefits will be completely incapable of working and earning some income. See, e.g., 42 U.S.C. § 1382(a) (defining income eligibility and providing that some income may be earned without affecting eligibility or causing a reduction in benefit amount); 20 C.F.R.

416.974 (explaining that, with respect to the determination of disability, some income may be earned without raising a presumption that the applicant is capable of substantial gainful activity). Beneficiaries' circumstances, moreover, are not static. Some beneficiaries will enjoy improved health or increased resources. 42 U.S.C. § 1383(a)(5)–(7) (providing that eligibility may cease if disability ceases). Given this recognition that beneficiaries' circumstances will differ and are changing and that not all beneficiaries will be incapable of contributing to the support of their children; given the Supreme Court's recognition that family law is preeminently a matter for the states, Rose, 481 U.S. at 625, 107 S.Ct. 2029; and given the widely, if not universally, held belief that one's children are not like one's creditors, that the duty to support one's children is vastly more important and fundamental than the duty to pay one's debts,[9] a trial court does not, we believe, act contrary to Congress' intent or do "major damage to clear and substantial federal interests," id., when it scrutinizes an SSI recipient's ability to provide child support. Where that ability is clearly established by evidence of non-SSI income, of earning capacity, or of SSI income in excess of the recipient's reasonable subsistence needs, the trial court may order the recipient upon pain of contempt to provide the support he or she is capable of providing.

### CONCLUSION

In sum, under our statutory scheme, Ivy's SSI benefits may be used in the

8. We recognize that SSI benefits are for the benefit of the recipients and not the recipients and "their families" as was the case with the veterans' benefits in Rose. However, this does not change our analysis.

9. In her concurring in part opinion in Rose, Justice O'Connor noted that children are not merely creditors: "Our Anglo–American tradition accords a special sanctity to the sup-

port obligation. Unlike other debts, for example, the obligation to support spouse and child is enforced on threat of contempt. These obligations, moreover, may not be discharged in bankruptcy.... In short, the support obligation has always been granted a special place in our law." 481 U.S. at 637–39, 107 S.Ct. 2029. (citations omitted).

calculation of her support obligation, and support arrears may, to the extent that to the trial court seems just, accumulate against her regardless of her present ability to meet that obligation. We therefore reverse the Court of Appeals' decision to the extent that it suggests that Ivy is immune from any support obligation on account of her SSI status. Ivy is subject, rather, notwithstanding her reliance on SSI, to both a support order and, in the event of noncompliance, to support-enforcement proceedings. The courts below did not err, however, by ruling that Ivy's guidelines-determined obligation was subject to adjustment under KRS 403.211(2). Because it is not clear from the record that the family court, in modifying Ivy's obligation, understood the full extent of its authority to make that adjustment or that it applied the balancing standard our statutes require between Ivy's interest in not being ordered to pay support she cannot afford and the Cabinet's interest in the accrual of support justly assessed against a parent whose ability to pay might increase so that future collection is a realistic possibility, we vacate the modified support order and remand for further proceedings in accord with this Opinion. On remand, accordingly, the Family Court is free to deviate from the guidelines upon a determination that the guidelines-derived obligation is unjust or inappropriate, but any such deviation should be supported by express reference to the pertinent evidence. Finally, we agree with the Court of Appeals that the trial court's finding of contempt was an abuse of discretion. An SSI recipient may be sanctioned for her failure to provide support only if it clearly appears that she was capable of providing support in addition to providing for her own reasonable needs, and evidence of that capability was lacking in this case. The upshot is that we affirm the decision of the Court of Ap-

peals in all respects except its ruling that Ivy's support obligation must be reduced to zero. That ruling we reverse, and, for an appropriate determination of Ivy's support obligation, we remand this matter to the McCracken Family Court. Future enforcement proceedings, if any, must be conducted consistent with this Opinion.

MINTON, C.J.; NOBLE, SCHRODER, and VENTERS, JJ., concur.
CUNNINGHAM, J., concurs in part and dissents in part by separate opinion in which SCOTT, J., joins.

CUNNINGHAM, J., Concurring in Part and Dissenting in Part:

While respectful of the well-crafted opinion of Justice Abramson, I concur in part and dissent in part. I concur with the reversal of the Court of Appeals which suggests that child support cannot be assessed against a recipient of Supplemental Security Income (SSI). I dissent, however, in our holding that there was insufficient evidence for the trial court to hold Appellee in contempt.

The record—and even the majority opinion—strongly suggest that the family court struggled through much proof taking and deliberation in reaching its finding of contempt. It reduced the amount owed to accommodate the evidence which reflected that Appellee's SSI income was not sufficient to take care of her own needs and pay the previously ordered child support. It is not a mystery to me, as it appears to be to the majority, why the family court set the reduced amount at $60 per month. It is not just coincidental that KRS 403.212(4) states in part that "[t]he minimum amount of child support shall be sixty dollars ($60) per month." Neither—I would suggest to the majority—was the trial court in the dark that this mother of four children could make that amount

without jeopardizing her monthly SSI amounts. This does not seem too much of a demand upon one who has four children, is "able-bodied," and totally free of the custody and care of any.

The trial court, after many months of testimony and hearings wherein it closely observed Appellee, found her to "be an able-bodied person capable of providing financial support to her child." I do not think that the trial court abused its very expansive discretion in either this finding or the ruling on contempt.

It is well known to the Court that for us to determine that the trial judge's decision was an abuse of discretion, we must determine that it was "arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *McKinney v. McKinney*, 257 S.W.3d 130, 133 (Ky.App.2008). As long as there is a "reasonable basis" for a family court's decision regarding child support, we cannot find that there is an abuse of discretion. *Downing v. Downing*, 45 S.W.3d 449, 457 (Ky.App.2001). Needless to say, the trial court is always the one in the best position to judge a person's physical and mental capabilities. Here, we have a mother who is drawing SSI because of mental or emotional deficiencies. The majority concedes that the receipt of SSI benefits is not in and of itself conclusive as to the inability to pay.

There was sufficient evidence in the record, and from numerous hearings and observations by the trial court, for the trial court to find that the Appellee was physically able to pay the amount requested. I search in vain to find anywhere in the record where her condition changed during that period of time. The trial court was exposed to the shifting positions taken by Appellee, depending upon her objectives. In her attempt to retain custody, she portrayed herself as plenty capable of taking care of her children. Conveniently, when the Cabinet came looking for child support, she claims total disability of earning any income. As Appellant points out in its brief, in at least one hearing Appellee was capable of representing herself and testified that her mental condition was under control.

In essence, I believe that, in this case, both the Court of Appeals and this Court have indulged in second-guessing and micro-managing the trial court's determination that this mother had the ability to earn at least $60 per month, plus $5 per month on the arrearage. This is especially true in this instance where the trial court was obviously not arbitrary but, in fact, labored patiently and thoughtfully through numerous hearings. For these reasons, I do not find that there was an abuse of discretion and must, therefore, dissent. Since we are remanding the case for further findings, I would at least allow the trial judge to also submit additional findings for our reconsideration on the contempt.

Therefore, I concur in part and dissent in part.

SCOTT, J., joins.