RENDERED: MAY 6, 2022; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2021-CA-1525-ME

JAY TODD                                                         APPELLANT

v.
APPEAL FROM WOODFORD CIRCUIT COURT
HONORABLE LISA HART MORGAN, JUDGE
ACTION NO. 18-D-00014-002

DANIELLE TACK                                                    APPELLEE

OPINION
AFFIRMING

** ** ** ** **

BEFORE: CLAYTON, CHIEF JUDGE; COMBS AND GOODWINE, JUDGES.

CLAYTON, CHIEF JUDGE: Jay Todd appeals from the entry of a domestic

violence order ("DVO") by the Woodford Circuit Court. He argues that there was

insufficient evidence to support the trial court's finding that his conduct created

fear of imminent physical injury. He also challenges the trial court's consideration

of evidence related to underlying child custody proceedings. Having reviewed the

record and applicable law, we affirm.

Todd and Danielle Tack are not married and have been involved in a custody dispute over their minor child ("Child") since 2018. At the time Tack filed her petition for a DVO, Todd was subject to a no-contact order in regard to Tack in a pending dependency, neglect, and abuse ("DNA") action filed by the Cabinet for Health and Family Services ("Cabinet") in the custody case.

Tack's petition, which was filed on November 6, 2021, made the following allegations:

> Around 10:00 p.m. last night, I heard my dogs barking and got up to see what they were barking at. I looked out my window and saw [Todd] standing there. My son was awake in the other room watching a movie with one of his friends. I was worried that [Child] would see or hear his dad and get upset. A petition was formed by the [C]abinet against [Todd] for neglect of [Child] because [Child] was present during events of domestic violence. [Todd] also refused to comply with the [C]abinet when they requested he drug test and take parenting classes. Child was removed from [Todd's] custody until our court date in January and the judge ruled that [Todd] was to have only supervised contact with Child at a center for several reasons, one being that during the time the Cabinet has been involved, he has said highly inappropriate things to Child that are not good for children to [be] privy to. [Todd] was also ordered to have no contact with me due to his escalating and threatening and intimidating behaviors. Our parenting coordinator was present and witnessed a few of these behaviors and [Todd] has told people he "wishes I'd disappear of[f] the face of the earth." [Todd] has a long and recent history of alcohol use and has shown up at my house intoxicated before refusing to leave. I had to contact his girlfriend to try to get him to leave. I was very fearful he was intoxicated this time as well since he

showed up unannounced at 10 p.m. at night. I was also very scared for my safety and my child's safety given his history of epo's [Emergency Protective Orders] filed against him. He knocked on the door several times, but I didn't answer. I peered through the window and took a picture of him, but I was scared he would see me or hear me and wasn't sure what his reaction would be. I was also afraid of what it would do to my son mentally if he realized his father was out there and how confusing and emotionally upsetting it would be to him if I had to refuse to let him speak to him or open the door. He flicked his cigarette and left after several attempts to get me to open the door and said, "Alright b***h. I'll make sure your a** goes to prison[.]" [H]e walked to his truck[,] got in his truck and screamed out the window "You're going to prison for f***ing fraud b***h" and sped off. I called the police, but not quick enough and he was gone by the time the officer got here. The officer said there wasn't anything he could do because there was no EPO against [Todd]. This made me feel hopeless and unsafe that my family and I have no real protection from him and his lack of boundaries or respect for authority. I woke up this morning to messages from [Todd's] Facebook that said "Nothing" and then a follow up message that said "Wrong person." I do not think this will end unless something is put in place to protect my family and myself.

An EPO was granted which restricted Todd from communicating with or coming within 500 feet of Tack or Child and awarded temporary custody of Child to Tack.

At the DVO hearing, Tack testified that Todd came to her house in violation of the no-contact order and that she was afraid of what would happen if she answered the door. She stated that on an earlier occasion she had sought an

EPO against Todd after she went to his place and found him drunk and threatening to beat Child's "m*****f***ing ass." She agreed to dismiss that EPO petition on the condition that he not drink around Child or use corporal punishment. She testified that drinking had always been an issue with Todd, and it was the reason they split up. When she was asked if Todd had ever committed physical violence, she described an episode in 2014 when he shoved her and pinned her against the wall. She locked herself in the bathroom and contacted someone to call Todd and "talk him down." On another occasion, she alleged he entered her home without permission and would not leave.

Tack further testified that Todd blamed her for the intervention of the Cabinet in their custody case and accused her of being "in cahoots" with Child Protective Services. She described his behavior as hostile during their parenting coordination sessions. She testified that during these sessions, she felt bullied, intimidated, and anxious.

On cross-examination, Tack acknowledged that on the night Todd came to her house she could not smell alcohol on his breath because she never opened the door. As evidence of his intoxication, she described his voice as slurred and said he seemed to be swaying. She conceded that he did not bang on the door or try to break in, just knocked persistently. She also testified that he did not make any threats of violence against her or Child. She explained that the

incident in which he allegedly threatened Child occurred in 2018 and she agreed she had voluntarily dismissed the EPO petition. She testified that Todd had never faced criminal charges in regard to her or Child. In regard to the parenting coordination sessions, she described his behavior as becoming more hostile. When the trial judge asked her whether she feared imminent harm, imminent physical injury, or serious physical injury would occur when Todd came to her house on November 5, she replied yes.

In his testimony, Todd admitted he knew he was violating the no-contact order when he went to Tack's residence but denied being under the influence of drugs or alcohol. He explained that he went there because he wanted to see Child. He admitted he had not participated in drug screenings as required by the Cabinet after his first test result was negative. He testified that he had consumed alcohol and used marijuana in the past month. He admitted he had been arrested for DUI over five years ago. He testified that two other women had sought EPOs against him, but they were dismissed. He admitted he posted Facebook messages describing Tack as "narcissistic and manipulating" because "every bit of it is absolutely true." He also wrote a Facebook post about coming for Child "with a vengeance" but stated he meant he would do so through legal action. He also admitted to making a Facebook post stating Tack "can't beat me

parent to parent in court so you manipulate the useless CPS to take the child away from an actual parent."

The trial court stated that it believed Tack's fear of imminent physical harm was very reasonable given the fact there was ongoing alcohol use, heightened litigation, a refusal to follow court orders, physical violence in the past, threatening, and intimidating behavior, and the fact that Todd showed up at Tack's house when there was a court order in effect prohibiting him from doing so. The court noted that Todd did not deny previous acts of physical violence occurred in 2014. It granted the DVO and made the following written findings:

> Court finds Petitioner's testimony that she is in fear of imminent physical harm to be credible and reasonable, that Respondent has previously engaged in act of physical violence, has long standing issues w/ alcohol abuse, becomes volatile, erratic, irate (especially when intoxicated), that his anger w/ her continues to escalate, and that he has refused to abide by orders of the court w/ impunity, and by showing up to her home at 10:00 pm after court had ordered no contact, while irate and exhibiting signs of intoxication, he inflicted fear of imminent harm. Court finds acts of dv have occurred, and given Respondent's recent actions, failure to address alcohol use, + ongoing litigation, DV may occur again.

This appeal by Todd followed.

Kentucky Revised Statutes ("KRS") 403.740(1) permits a court to issue a DVO if, following an evidentiary hearing, the court "finds by a preponderance of the evidence that domestic violence and abuse has occurred and

-6-

may again occur[.]" KRS 403.720(1) defines "domestic violence and abuse" as "physical injury, serious physical injury, stalking, sexual abuse, strangulation, assault, or the infliction of fear of imminent physical injury, serious physical injury, sexual abuse, strangulation, or assault between family members or members of an unmarried couple[.]" "Physical injury" is defined as "substantial physical pain or any impairment of physical condition[.]" KRS 500.080(15). "Imminent" is defined as "impending danger, and, in the context of domestic violence and abuse as defined by KRS 403.720, belief that danger is imminent can be inferred from a past pattern of repeated serious abuse." KRS 503.010(3).

When a trial court is the factfinder, "[f]indings of fact, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." Kentucky Rules of Civil Procedure (CR) 52.01. Findings are not clearly erroneous if they are "supported by substantial evidence or, in other words, evidence that when taken alone or in light of all the evidence has sufficient probative value to support the trial court's conclusion." *Rupp v. Rupp*, 357 S.W.3d 207, 208 (Ky. App. 2011) (citation omitted). "[I]n reviewing the decision of a trial court the test is not whether we would have decided it differently, but whether the court's findings were clearly erroneous or that it abused its discretion." *Gomez v. Gomez*, 254 S.W.3d 838, 842 (Ky. App. 2008) (citation omitted). "The test for abuse of discretion is whether the

trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Goodyear Tire and Rubber Co. v. Thompson*, 11 S.W.3d 575, 581 (Ky. 2000) (citation omitted). We are also well aware that the "filing of a DVO petition has enormous significance to the parties involved." *Wright v. Wright*, 181 S.W.3d 49, 52 (Ky. App. 2005). The grant of a DVO "may afford the victim protection from physical, emotional, and psychological injury," but, "[o]n the other hand, the impact of having an EPO or DVO entered improperly, hastily, or without a valid basis can have a devastating effect on the alleged perpetrator." *Id*.

As a preliminary matter, we address Todd's contention that the trial court improperly considered evidence from the custody case and the DNA proceedings had improperly breached the confidentiality of the prior proceedings. The same trial judge presided over the custody, DNA, and DVO proceedings, and she referred to them in her comments at the DVO hearing. The records from these cases were not formally entered at the hearing, but evidence relating to them was introduced through the allegations of Tack's petition and the testimony of both parties. Todd did not object to the introduction of the evidence until the end of the DVO hearing and he did not dispute the existence of the no-contact order entered in the DNA action or that he violated its terms by going to Tack's residence. Insofar as evidence pertaining to the custody and DNA actions was introduced

without objection in the DVO proceedings, it will be considered as part of our review. "It is only to avert a manifest injustice that this court will entertain an argument not presented to the trial court." *Petrie v. Brackett*, 590 S.W.3d 830, 834 (Ky. App. 2019). Todd does not argue that the introduction of this evidence resulted in manifest injustice, and we disagree with his contention that it was not relevant to the DVO proceedings. In effect, he is arguing that the DVO petition should have been adjudicated solely on the basis of what occurred on November 5, 2021. But "[t]he predictive nature of the [DVO] standard requires the family court to consider the totality of the circumstances[.]" *Pettingill v. Pettingill*, 480 S.W.3d 920, 925 (Ky. 2015). The background facts relating to the custody case and the issuance of the no-contact order provided the context for what occurred on November 5, 2021, and enabled the trial court to understand and assess more fully the risk level posed by Todd's behavior.

Tack seeks to have us take judicial notice of the no-contact order, which she has attached as an exhibit to her brief. "While judicial notice may be taken at any stage of the proceedings, KRE [Kentucky Rules of Evidence] 201(f), it is to be used 'cautiously' by appellate courts." *Commonwealth, Cabinet for Health and Family Services v. Ivy*, 353 S.W.3d 324, 335 (Ky. 2011). We decline to do so in this case, as it is not necessary to a resolution of this appeal.

Todd argues that the issuance of the DVO was erroneous because there was no rational, factual basis for the finding that Tack was in fear of imminent physical injury when Todd came to her house. He points out that he did not make any threats of violence against her or Child, Child never even knew he was at the home, he never attempted to break into the house or even bang on the door, and he questions Tack's testimony that he was under the influence of alcohol, as they never spoke to one another on that occasion. As to the prior instances of domestic violence, Todd argues that Tack undermined her own case by acknowledging that she voluntarily dismissed her past petition and by admitting that Todd had never been criminally prosecuted for any acts of violence or threats of violence.

Todd relies on a series of cases which he claims set forth facts much more egregious than what occurred in this case yet were not deemed sufficient to support the issuance of a DVO. In one case he cites, *Hall v. Smith*, the petitioner alleged that her ex-husband had been physically and mentally abusive during their marriage; that he had pulled a gun on his ex-girlfriend and was charged with aggravated assault; that he was mentally abusive towards their teenage children; that her daughter had observed him with a gun; and that he had driven down her street although he was not supposed to be within 1000 feet of her home. 599 S.W.3d 451, 453 (Ky. App. 2020).

But in *Hall*, there was "no testimony about an **imminent** danger of domestic violence." *Id*. at 454 (emphasis added). By contrast, Todd did more than drive down Tack's street. He came to her door, in blatant disregard of a no-contact order. Apparently intoxicated, he knocked repeatedly at the door and then cursed, shouted, and threatened to send her to prison. The trial court found Tack to be a credible witness regarding his intoxication, a determination uniquely within the trial court's purview. The threat presented by Todd was immediate and imminent, by virtue of his close proximity to Tack's home in violation of a court order and by the nature of his behavior.

In *Caudill v. Caudill*, another case cited by Todd as containing allegations "above and beyond" what Tack alleged, a DVO was issued based on the claims of a petitioner that her former spouse ignored her repeated directives to stay away from her workplace, verbally abused her, may have had a permit to carry a concealed weapon, and once pushed past her to enter their home. 318 S.W.3d 112, 114 (Ky. App. 2010). This Court held that the DVO was not supported by substantial evidence. Unlike *Caudill*, however, there was evidence that Todd committed more than verbal abuse when he shoved Tack and pinned her against the wall and made an explicit threat of violence against Child. Additionally, Todd did more than ignore a personal directive to stay away from a workplace; he violated a no-contact order in going to Tack's home.

The facts of the present case also differ significantly from those in *Pasley v. Pasley*, in which the petitioner alleged that her former husband came by her house to see their children when it was not his visitation day and nonetheless told her he would see them. 333 S.W.3d 446, 447 (Ky. App. 2010). He also showed up at their son's school. She further alleged that one day she came home and found the back window of her house opened and a tool in her flowerbed. She did not know if her former husband was responsible but thought he was. She stated that she was afraid of him. *Id*. This Court reversed the grant of the DVO on the grounds that the petitioner failed to make any allegations of physical injuries or abuse or of threats of physical injury or abuse. Todd contends that Tack similarly never alleged physical injuries or abuse or fear of imminent physical injury and that knocking on and yelling at a door are not sufficient to support a DVO. However, when Todd's behavior on the evening of November 5 is assessed in light of evidence that he had been physically abusive in the past, had made a threat against Child, had caused Tack to feel bullied and intimidated at parenting coordination sessions, and was blatantly disregarding a no-contact order, Tack's fear of imminent physical injury was not unreasonable.

In *Clark v. Parrett*, Parrett's ex-boyfriend, Clark, with whom she had had no contact for fourteen months, began hanging around her apartment and then banged on her door, stating, "'let me the f* * * in, I want to talk to you.[']" 559

S.W.3d 872, 873 (Ky. App. 2018). Clark filed a DVO petition claiming that she was afraid because when she and Clark broke up, he put her belongings out on the front porch, and he owned multiple guns. The family court issued a DVO based solely on these allegations, without holding a hearing. This Court held that the allegations, standing alone, were insufficient to support the DVO, as they did not provide a basis to explain why Clark was afraid except that they had not had any contact for fourteen months and he was angry when they broke up. As to her allegation that he had guns, she never claimed that he had threatened her with them or that she was fearful he would shoot her. The Court held that a hearing was necessary to determine whether Parrett could have testified about additional matters to establish that Clark committed domestic violence against her previously or whether Clark's actions when knocking on her door caused infliction of fear of imminent physical injury. *Id.* at 876.

By contrast, Tack's claim that she feared imminent physical injury was supported by her testimony that Todd had shoved her, threatened Child with physical violence, was ready to disobey a court order to come to her home and make threats, and that his behavior was making her feel increasingly intimidated and fearful.

Todd also argues that there is no evidence of outright physical abuse in this case. But he does not dispute that he shoved Tack in the past and made a

threat of violence against Child.  This latter threat is similar to the situation in *Williford v. Williford*, in which this Court upheld the issuance of a DVO which was granted to a petitioner who overheard his wife in a telephone conversation with her sister stating that she planned to get into an argument with him and "blow his head off."  583 S.W.3d 424, 426 (Ky. App. 2019).  Although he did not make explicit threats of physical violence on November 5, Todd knocked repeatedly, shouted, used obscenities, appeared to be intoxicated, and told Tack he was going to make sure she went to prison, all in the context of openly defying a court order.  These facts, coupled with the fact he had shoved and pinned Tack to the wall in the past, were sufficient to support the trial court's determination that his behavior created an imminent fear of physical harm.

For the foregoing reasons, the entry of the DVO is affirmed.


ALL CONCUR.


| BRIEFS FOR APPELLANT: | BRIEF FOR APPELLEE: |
| --- | --- |
| W. Steven Middleton | Ellen C. Moore |
| Frankfort, Kentucky | Versailles, Kentucky |