RENDERED: MARCH 13, 2026; 10:00 A.M.
TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2025-CA-0629-ME

N.L. AND B.L.                                                        APPELLANTS


APPEAL FROM JEFFERSON CIRCUIT COURT
v.        HONORABLE LAURA P. RUSSELL, JUDGE
ACTION NO. 23-J-503496-002


COMMONWEALTH OF KENTUCKY,
CABINET FOR HEALTH AND
FAMILY SERVICES AND T.L., A
MINOR CHILD                                                          APPELLEES

AND


NO. 2025-CA-0630-ME

N.L. AND B.L.                                                        APPELLANTS


APPEAL FROM JEFFERSON CIRCUIT COURT
v.        HONORABLE LAURA P. RUSSELL, JUDGE
ACTION NO. 23-J-503495-003


COMMONWEALTH OF KENTUCKY,
CABINET FOR HEALTH AND
FAMILY SERVICES AND C.L., A
MINOR CHILD                                                          APPELLEES

AND

NO. 2025-CA-0631-ME

N.L. AND B.L.                                                    APPELLANTS


                    APPEAL FROM JEFFERSON CIRCUIT COURT
v.                  HONORABLE LAURA P. RUSSELL, JUDGE
                    ACTION NO. 23-J-503494-003



COMMONWEALTH OF KENTUCKY,
CABINET FOR HEALTH AND
FAMILY SERVICES AND R.L., A
MINOR CHILD                                                      APPELLEES

AND

NO. 2025-CA-0637-ME

N.L. AND B.L.                                                    APPELLANTS


                    APPEAL FROM JEFFERSON CIRCUIT COURT
v.                  HONORABLE LAURA P. RUSSELL, JUDGE
                    ACTION NO. 23-J-503494-002



COMMONWEALTH OF KENTUCKY,
CABINET FOR HEALTH AND
FAMILY SERVICES AND R.L., A
MINOR CHILD                                                      APPELLEES

AND

NO. 2025-CA-0772-ME


N.L. AND B.L.                                                                          APPELLANTS



                        APPEAL FROM JEFFERSON CIRCUIT COURT
v.                      HONORABLE LAURA P. RUSSELL, JUDGE
                        ACTION NO. 23-J-503496-003



COMMONWEALTH OF KENTUCKY,
CABINET FOR HEALTH AND
FAMILY SERVICES AND T.L., A
MINOR CHILD                                                                            APPELLEES

AND


NO. 2025-CA-0774-ME


N.L. AND B.L.                                                                          APPELLANTS



                        APPEAL FROM JEFFERSON CIRCUIT COURT
v.                      HONORABLE LAURA P. RUSSELL, JUDGE
                        ACTION NO. 23-J-503495-002



COMMONWEALTH OF KENTUCKY,
CABINET FOR HEALTH AND
FAMILY SERVICES AND C.L., A
MINOR CHILD                                                                            APPELLEES

<u>OPINION</u>
<u>AFFIRMING AND REMANDING</u>

\*\* \*\* \*\* \*\* \*\*

BEFORE:  CALDWELL, MᴄNEILL, AND MOYNAHAN, JUDGES.

CALDWELL, JUDGE:  N.L. ("Father") and B.L. ("Mother") (collectively
"Parents") appeal from a contempt finding and sanction.  We affirm.

**FACTS**

By separate Opinion rendered this same date, the family court's
finding Parents' three youngest children to be abused or neglected has been
affirmed.[1]  *See N.L. v. Cabinet for Health and Fam. Servs.*, Nos. 2025-CA-0080-
ME, 2025-CA-0083-ME, 2025-CA-0084-ME, 2025-CA-0086-ME, 2025-CA-
0087-ME, & 2025-CA-0088-ME, (Ky. App. Mar. 13, 2026).  Henceforth, we refer
to the dependency, neglect, and abuse action as "the DNA proceeding."

The family court had entered its disposition order in the DNA
proceeding on December 19, 2024.  The family court allowed the children to
remain in Parents' custody.  But it also ordered that the Cabinet for Health and
Family Services ("the Cabinet") and Jefferson County Public Schools ("JCPS")

---

[1] Since this appeal stems from proceedings in which minor children were adjudicated to be
abused or neglected, we do not refer to the individual children or their parents by name.
Kentucky Rules of Appellate Procedure ("RAP") 5(B)(2) ("Initials or a descriptive term must be
used instead of a name in cases involving juveniles, allegations of abuse and neglect, termination
of parental rights, mental health, and expungements.").

continue to monitor the family. The order also specifically stated that the children must attend school in person each day and that Parents must cooperate with the Cabinet and JCPS.

A couple of days after the disposition order's entry, JCPS' winter holiday break began. Inclement weather delayed JCPS' reopening until January 13th, 2025. On that day, Mother withdrew the children from JCPS. On all three withdrawal forms, Mother listed a new address in Ann Arbor, Michigan. She also indicated the children would be homeschooled in Michigan on some forms.

In mid-February 2025, the Cabinet filed a motion seeking to hold Parents in contempt for violating the family court's orders.[2] The Cabinet attached to the contempt motion an affidavit by Amy Logsdon Risley ("Risley"), a JCPS social worker and keeper of the records. Risley averred that Mother told JCPS staff she did not need to file paperwork in Michigan or forward her children's educational records to Michigan because Michigan did not require documentation

---

[2] This Court granted Parents emergency relief (shortly before the contempt motion was filed) and then a writ of prohibition in a related case stemming from the filing of an additional set of DNA petitions in late January 2025. *See* Exhibits E and F to Appendix to Appellant red brief (Order entered February 6, 2025, and Order Granting Writ of Prohibition entered March 31, 2025, in No. 2025-CA-0158-OA). The writ of prohibition was granted a few days after the family court's hearing on the contempt motion.

The record for the case initiated by the late January 2025 petition(s) and leading to the issuance of the writ is not before us. Moreover, the present appeal is from the resolution of contempt proceedings in the separate DNA proceeding previously initiated in late 2023—not from the DNA proceeding for which we issued a writ of prohibition.

for homeschooling. She also averred that despite Mother's telling JCPS staff the family had relocated to Michigan over the holiday break, school personnel observed some of the children in the Louisville area in January 2025. Risley expressed concerns the children would be placed at risk of further educational neglect if homeschooled by Mother rather than attending school in person.

In late March 2025, the family court conducted an evidentiary hearing to determine if Parents were in contempt. The Cabinet called Risley to testify. Risley testified that in February 2025 she contacted Ann Arbor public school district personnel, who reported the children were not enrolled in school there. Risley also stated that Ann Arbor district personnel later told her the children were first signed up for school on March 11, 2025. She also reported being told the youngest child went to school that same day, but the two older children had not attended school in Ann Arbor.

After Risley's testimony concluded, Parents' attorney called Mother to testify. Mother testified to being told by a Cabinet worker that there would be no problem with the family moving to Michigan and there was nothing further she had to do. She took this statement to mean it would be fine to homeschool in Michigan. She also testified to consulting attorneys and believing Kentucky court orders no longer applied once the family moved to Michigan.

Mother stated that when she heard of the pending contempt motion based on Parents' not sending the children to in-person school in Michigan, she tried to enroll the children in school in Ann Arbor public schools to comply with the court's orders. Mother also testified the Ann Arbor school district was a desirable one which required extensive documentation of residency, and it took several weeks to complete the process of enrolling the children in school.

Mother testified that on March 11, 2025, all three children had been signed up for school in Ann Arbor and the youngest child went to school that day. Mother admitted, however, that the other two children had not yet started attending school in Michigan as of the late March hearing. She stated the other two children would start attending in-person school on March 31, 2025. She said the oldest minor child would turn eighteen just a few weeks after the hearing.

At the end of the hearing, the family court judge stated she would be finding Parents in contempt and entering a written order to that effect. However, she scheduled an additional hearing to determine an appropriate sanction.

In early April 2025, the family court issued its written order finding Parents in contempt. The court found JCPS had 39 school days from January 13, 2025, until the youngest child attended his first day of school in Michigan on March 11, 2025. It also found it heard no testimony that the older two children had attended any days of school since being withdrawn from JCPS.

The court noted Risley testified to Mother's saying she would go back to homeschooling once the court cases were done and Risley's replying that the court's orders would remain in place even when the cases were over. The court indicated it found Risley's testimony credible.

On the other hand, the court did not find Mother's testimony credible. The court noted Mother could not identify a date on which the family moved. Also, the court noted Mother testified to Ann Arbor being where Mother's in-laws had lived for 35 years and to the family's deciding to move there over holiday break. The court found it odd that Mother also testified to not doing any research about the school district or the schools the children would attend despite planning to send the children to school there. The family court stated it did not believe Mother's explanation that she wrote "homeschool" on forms because she had to say where the children would attend school after leaving JCPS and she did not know what school the children would be attending in Michigan yet.

The court also found that despite Mother's claiming a Cabinet worker made a statement in January 2025, which Mother thought meant she could homeschool the children in Michigan, Mother testified to enrolling the children in Ann Arbor schools in mid-February 2025. The court also noted Mother's claimed mid-February enrollment date conflicted with the actual enrollment date provided

by the Ann Arbor school district (3/11/2025).[3] The court found Mother offered no extrinsic evidence to support her claims.

The family court found, by clear and convincing evidence, that Parents had withdrawn the children from JCPS on January 13, 2025, and had not enrolled them in Ann Arbor schools until March 11, 2025, thus violating the December 2024 disposition order. The court found Parents did not show they were unable to comply with the court's order or that their non-compliance was justified.

The family court conducted an additional hearing to determine an appropriate sanction for contempt in late April 2025. A few days later, it entered its written order imposing a sanction.

The family court indicated it found Parents to be in civil contempt, citing authority about appropriate sanctions for civil contempt. It further stated that for their willful contempt, Mother and Father "are each sentenced to ninety days['] incarceration, conditionally discharged for a period of two years." (Page 2 of Order entered May 5, 2025, Record ("R."), p. 213—also attached as Appendix B to Appellant red brief.)

---

[3] Mother's and Risley's testimony reflected different understandings of what enrollment entailed. Mother seemingly viewed signing up for school as the same thing as enrollment. However, Risley explained that, at JCPS, signing up for school meant filling out forms which might be done online, while enrollment meant that a student showed up to start attending school. She testified that sometimes parents signed children up for school, but a long time passed before the children showed up to attend school and were therefore considered enrolled.

The court stated Parents had the opportunity to purge themselves of contempt by making sure their minor children attend school daily unless medically excused and by providing to the court and County Attorney quarterly certified records of the children's school attendance during the conditional discharge period. The court further found Parents were presently able to make sure their children attend school daily and may avoid incarceration by complying with this order. It further stated the sanction was imposed to coerce Parents to comply with its order for the children's benefit.

Parents filed a timely appeal, challenging both the contempt finding and the sanction imposed. Further facts will be provided as needed in our analysis.

## ANALYSIS

Before we address the parties' arguments about the contempt finding and sanction, we first note that Parents have raised no issues about the family court's jurisdiction in this appeal. (In other words, they have not argued that the family court lacked jurisdiction when conducting these contempt proceedings.) However, we are aware that some people might perceive that the family court's jurisdiction might be questionable after a family relocation to Michigan.

Despite any such perceptions, the family court clearly had subject matter jurisdiction here. Subject matter jurisdiction, which cannot be established by consent or waiver, is the court's power to hear and rule on a particular type of

-10-

case. *Nordike v. Nordike*, 231 S.W.3d 733, 737-38 (Ky. 2007). Clearly, the family court had the power to hear and make rulings in this type of case—dependency, neglect, and abuse proceedings—pursuant to KRS[4] 610.010(2)(d).

Unlike subject matter jurisdiction, however, personal jurisdiction and particular-case jurisdiction issues may be waived by failure to raise such issues. *See generally Basin Energy Co. v. Howard*, 447 S.W.3d 179, 184-85 (Ky. App. 2014); *Baum v. Aldava*, 713 S.W.3d 96, 105 (Ky. 2025). Because Parents do not challenge the family court's jurisdiction in their appellate briefs, we decline to reach any issues about personal or particular-case jurisdiction in this Opinion. Instead, we simply address the parties' arguments about the contempt finding and sanction imposed.

## Standards of Review

We review the family court's contempt decision for abuse of discretion, keeping in mind courts have broad discretion to enforce their orders by exercising their contempt powers. *Meyers v. Petrie*, 233 S.W.3d 212, 215 (Ky. App. 2007). *See also Commonwealth, Cabinet for Health and Family Services v. Ivy*, 353 S.W.3d 324, 332 (Ky. 2011) (hereinafter "*Ivy*"). However, we review factual findings for clear error. *Id*. In other words, we may not disturb factual

---

[4] Kentucky Revised Statutes.

findings which are supported by substantial evidence and thus not clearly erroneous. *Sewell v. Sweet*, 637 S.W.3d 330, 334 (Ky. App. 2021); CR[5] 52.01.

With these parameters in mind, we first consider Parents' allegation that the family court erred in finding them in contempt.

**Parents Were Not in Compliance with the Family Court's Order at Time of Contempt Finding; Family Court Did Not Err in Finding Them in Contempt**

Parents assert the contempt finding was in error because, in their view, they were in compliance with family court orders at the time of the late March 2025 contempt hearing since they had "enrolled" the children in Ann Arbor schools on March 11, 2025.

We disagree. The family court found that Parents willfully violated the December 2024 disposition order, which it had noted required them to make sure their three minor children **attend** school every day unless medically excused.

The family court also found that although the youngest child started attending school in Michigan on March 11, 2025, it heard no testimony showing the two older children had attended any days of school since their withdrawal from JCPS that January. (In fact, Mother admitted the two older children had not yet started attending Ann Arbor schools as of the late March 2025 contempt hearing date based on our review of the recorded hearing.)

---

[5] Kentucky Rules of Civil Procedure.

Thus, there was no error in the family court's finding Parents in violation of the Disposition Order, and the evidence does not compel a finding that Parents were presently in compliance with court orders at the time of the late March 2025 contempt hearing.[6]

The family court's factual findings were supported by substantial evidence, especially considering its prerogative to assess witness credibility and to weigh the evidence. *See generally* CR 52.01; *Moore v. Asente*, 110 S.W.3d 336, 354 (Ky. 2003). Moreover, we detect no abuse of discretion in its finding Parents in contempt for willfully violating its orders based on the record before us.

In sum, we discern no reason to disturb the contempt finding— especially since we reject Parents' assertion that they were presently in compliance with the family court's orders by the contempt hearing date.[7] Next, we address Parents' arguments about the sanction imposed.

---

[6] The family court did not expressly declare in the contempt finding order that Parents were not presently complying with its orders as of the contempt hearing date. But this order reflects an implicit finding that Parents were not presently in compliance with the December 2024 disposition order at that time. After all, the court found Parents willfully violated the disposition order after earlier noting the disposition order required the children's daily attendance at school unless medically excused and finding two of the children were still not attending school as of the contempt hearing date. We further note Parents have not asserted that the children's absence from in-person school was medically excused, nor have they pointed to any evidence showing that all three children were presently attending school as of any later pertinent date—such as the sanction hearing on April 30 or the entry of the sanction order shortly thereafter.

[7] At most, Parents presented evidence that they were partially complying with the disposition order by sending their youngest child to school beginning on March 11, 2025. But the evidence is undisputed that none of these three children attended school in person from the date of their JCPS withdrawal (January 13, 2025) until the youngest child started attending in-person school

-13-

**Family Court Imposed a Proper Sanction for Civil Contempt**

Parents contend the family court erred in imposing the sanction for civil contempt. They assert that civil contempt sanctions cannot be properly imposed when a party has already achieved compliance with court orders and suggest they were fully compliant with the court's orders by the sanctions hearing. However, we have already rejected the argument that they were in compliance by the contempt hearing date. And Parents point to no evidence that all three children were attending school by the sanctions hearing date.

Having rejected Parents' assertion that they were in full compliance with court orders by the sanctions hearing, we also reject their argument that the sanction was punitive rather than coercive because there was nothing for the family court to coerce them into doing. On the contrary, the family court had recently found a lack of evidence that the two older children had attended school since leaving JCPS that January—despite the disposition order's requirement that all three children attend school daily unless medically excused. Thus, there was something for the family court to coerce Parents to do and the court did coerce them to do something—namely, to send the children to school daily unless

_____

in Michigan approximately two months later and that the two older children were still not attending in-person school on the late March 2025 hearing date.

medically excused (as previously ordered) and to provide quarterly certified records of the children's school attendance.

That being said, we must still grapple with Parents' arguments that the sanction imposed was not a proper sanction for civil contempt.

> Contempt sanctions are classified as either criminal or civil depending on whether they are meant to punish the contemner's noncompliance with the court's order and to vindicate the court's authority and dignity, or are meant to benefit an adverse party either by coercing compliance with the order or by compensating for losses the noncompliance occasioned.

*Ivy*, 353 S.W.3d at 332. "For the punishment to retain its civil character, the contemnor must, at the time the sanction is imposed, have the ability to purge the contempt by compliance and either avert the punishment or at any time bring it to an end." *Id*. at 334-35.

Parents assert that the family court improperly imposed a punitive rather than a coercive sanction despite finding them to be in civil contempt, not criminal contempt. They also argue that the sanction improperly punished future conduct and did not properly accord them an opportunity to purge their contempt.

Parents point to our Supreme Court's criticism of the contempt sanction in *Ivy*. In *Ivy*, the Supreme Court held the family court erred in finding Ms. Ivy in contempt because it failed to properly consider her ability to pay her child support obligation. It emphasized the Social Security Administration's

determinations that Ms. Ivy was disabled and needed the full amount of her Social Security benefits for her own subsistence. *Id.* at 333-34. The family court had sentenced Ms. Ivy to thirty days in jail, but stayed the execution of this sentence so long as she paid her ongoing child support obligation and made additional payments until the arrearage was paid in full. *Id*. at 335.

Our Supreme Court held that the family court's threatening Ms. Ivy with incarceration for future violations of the child support order "did not provide her with a true opportunity for purging, and thus was invalid." *Id.* It further stated:

> the purge condition of a coercive order must be something presently within the contemnor's ability to perform. Ivy had no present ability to perform future obligations. By itself, moreover, a future failure to pay would not, in and of itself, the court's order notwithstanding, justify Ivy's incarceration. That future conduct was not, and could not be, the subject of the pending contempt motion because it had yet to occur. If Ivy did fail to pay, she would be entitled to notice, a new hearing, and a finding that at that future point in time she had the ability to comply.

*Id.*

In addition to *Ivy*, Parents also cite *Crandell v. Cabinet for Health and Family Services ex rel. Dilke*, 642 S.W.3d 686 (Ky. 2022) (hereinafter "*Crandell*"), to argue the contempt sanction imposed here was improper. Specifically, they emphasize our Supreme Court's holding that the family court abused its discretion

-16-

by issuing a contempt sanction that "seeks to punish future contempt rather than present contempt[.]" *Id.* at 688.

*Crandell* briefly noted that the family court made a finding of civil contempt and discussed the burden of proof for civil contempt. *Id.* at 689-90. Ultimately, our Supreme Court upheld the contempt finding, but not the sanction imposed. *Id.* at 691-92.

*Crandell* does not engage in a detailed discussion of the differences between civil contempt and criminal contempt. For example, it does not cite authority discussing how civil contempt sanctions serve to coerce compliance or compensate adverse parties whereas criminal contempt sanctions serve to punish prior acts of contempt. *See Ivy*, 353 S.W.3d at 332. *See also Meyers*, 233 S.W.3d at 215 ("When a court seeks to coerce or compel a course of action, the appropriate sanction is civil contempt. However, when a court seeks to punish conduct that has already occurred or to vindicate its authority, the appropriate sanction is criminal contempt.") (citations omitted).

After discussing its reasons for upholding the finding that Crandell was in contempt, our Supreme Court vacated the contempt sanction imposed, stating as follows:

> Here, the family court's order required that should Crandell fail in the future to meet his support obligation, he would be incarcerated. The order contains the same error written about in *Ivy*: the family court made future

-17-

conduct "the subject of the pending contempt motion," even though "it had yet to occur." *Id.* at 335. Doing so was improper. Just as in *Ivy*, here, Crandell should have been "entitled to notice, a new hearing, and a finding that at [the future points] in time, [he] had the ability to comply" for each new finding of future contempt. *Id.* (citation omitted). Instead, the family court ordered that Crandell's future failure to pay would be punishable by a 20-day period of incarceration each month he failed to meet his support obligation. There was no termination provision to the order—presumably, for the rest of his life, Crandell was to be subject to monthly 20-day jail stays if he failed to pay.

Because the family court sought to coercively punish Crandell's future conduct, the order was an abuse of discretion. The family court may only purge *present* contempt in executing a remedy. We therefore remand the issue of the remedy for further findings or other proceedings as necessary and consistent with this Opinion.

*Crandell*, 642 S.W.3d at 691-92.

Next, our Supreme Court discussed how it was practically impossible for Crandell to fully comply with the court's orders and how there was no end date to the contempt sanction's application:

Having concluded the ordered remedy was erroneous, we find it instructive to further consider the practicality of the order itself. The order approaches impossibility. Technically, the $251 Crandell would owe each month amounts to roughly five full working days of minimum wage earnings. Logistically, however, the requirement is practically infeasible. The family court in this case had a clear and convincing showing of Crandell's present lack of work. That means that Crandell, before the 11th of the next month, would need

-18-

> to *find* work. It takes time to apply and be accepted to work, then more time to receive your first check (assuming you find an employer willing to hire you with the knowledge that you may be either restricted by work release, or absent fully for almost three weeks at a time). In the likely event that Crandell fails to find work *and* work enough to make the future payment amount, he will be put in jail. If released, he must try all over again with only 8, 10, or 11 days, depending on the month, before he had to report to jail again. This system of twenty days in, a bit over a week out—for the rest of Crandell's life—is a Sisyphean cycle that will likely manage to both expend county resources and fail to accomplish the goal of satisfying Crandell's outstanding arrearage. The order is completely impractical from a compliance perspective, and makes it less likely that Crandell will ever satisfy the arrearage.

*Id*. at 692.

Parents' argument does not focus on the Supreme Court's discussion of the lack of a termination date for the contempt sanction in *Crandell*, nor its expression of concerns that the imposed sanction could easily lead to a person being incarcerated without notice or a hearing for being unable to pay a child support obligation. Nor do Parents emphasize how our Supreme Court reversed the contempt finding in *Ivy* for lack of proper consideration of her ability to pay her child support obligation, or its focus on the principle that courts may not compel people to perform impossible acts.

Instead, Parents emphasize our Supreme Court's general language about persons' lacking the present ability to perform future acts to suggest that any form of conditional discharge in a civil contempt sanction is improper.

Moreover, Parents assert that this Court applied the same principle forbidding contempt sanctions aimed at punishing future contempt to a case not involving child support in a recent unpublished opinion.[8]  Parents argue: "Imposing sanctions to ensure future compliance serves no coercive purpose and amounts to a punitive measure for potential future behavior."  (Appellant red brief, page 11.)

The Cabinet points out that *Ivy* and *Crandell* are distinguishable as child support cases involving issues about whether the parents had the ability to

---

[8] *See Armstead v. Armstead*, Nos. 2023-CA-0590-ME & 2023-CA-0894-MR, 2024 WL 3075029, at \*4 (Ky. App. Jun. 21, 2024) (unpublished) (hereinafter "*Armstead*") ("Furthermore, the conditional probation exists to potentially punish Amy for future contempt violations, which is not permitted.").

Unpublished opinions are not binding authority.  RAP 41(A).  Nonetheless, we discuss this unpublished opinion to respond to the parties' arguments about it in their appellate briefs.  Also, we may consider such an unpublished opinion persuasive, though not binding.  *See, e.g.*, *Lazar v. Lazar*, 678 S.W.3d 472, 477 n.5 (Ky. App. 2023).  Moreover, we are unaware of any published authority directly on point concerning contempt sanctions involving conditional sentences probated on future compliance in a non-financial context.  *See* RAP 41(A)(3) ("A party may cite to and rely on a 'Not To Be Published' opinion for consideration if[,]" in addition to fulfilling other RAP 41(A) requirements, "there is no published opinion of the Supreme Court or the Court of Appeals that would adequately address the point of law argued by the party[.]").

We remind the parties' attorneys of the obligation to note the non-binding nature of unpublished opinions when citing such unpublished opinions for our consideration.  RAP 41(A)(4).

pay. It suggests *Ivy* and *Crandell* focus on the principle that a court cannot hold a party liable for failing to perform an impossible act. The Cabinet asserts that the family court's contempt sanction here does not require Parents to pay any amount of money, and that Parents are clearly able to comply with the court's simple condition that they send their minor children to school.[9]

As for this Court's unpublished opinion stating that sanctioning future conduct is impermissible in a context not involving issues about one's ability to meet financial obligations, the Cabinet points out some significant distinctions. For example, it points out the parent held in contempt for failure to comply with a parenting time order (Ms. Armstead) was denied her request for counsel or a continuance of the contempt hearing and was called to testify against herself.[10] In contrast, Parents were represented by counsel throughout the family court proceedings, including the contempt and sanction hearings.

The Cabinet also notes this Court determined that the sanction for Ms. Armstead was "criminal in nature"[11] and failed to provide her with an opportunity

---

[9] The sanction order also required Parents to provide quarterly certified records of their children's school attendance which could potentially involve some time and expense, albeit likely minimal.

[10] *Armstead*, 2024 WL 3075029, at *4.

[11] *Id*.

to purge the contempt.[12]  In contrast, the Cabinet asserts that the civil contempt sanction here provided Parents an opportunity to purge contempt by making sure the children attend school regularly.

On the other hand, Parents emphasize our Supreme Court's statement in *Crandell* that:  "Because the family court sought to coercively punish Crandell's future conduct, the order was an abuse of discretion.  The family court may only purge *present* contempt in executing a remedy."  642 S.W.3d at 692.

Again, Parents argue there was no present contempt, which we have previously rejected.  Nonetheless, though the record does not compel a finding that they were not presently in contempt, we recognize the sanction imposed may appear questionable considering certain statements in *Crandell* and *Ivy*.  (We note our Supreme Court reversed the contempt finding in *Ivy*, though it also criticized the sanction.  *See* 353 S.W.3d at 332-25.  In contrast, our Supreme Court upheld the contempt finding in *Crandell*, but it reversed the contempt sanction based in part on its discussion of sanctions in *Ivy*.  *See Crandell*, 642 S.W.3d at 691-92.)

Despite the seemingly broad prohibitions against any contempt sanction conditioned on any future conduct in *Crandell* and *Ivy*, we disagree with any argument that such precedent forbids any sort of conditionally discharged

---

[12] *Id.* ("Though the imprisonment was conditionally probated on her compliance with all orders of the circuit court, the condition did not allow Amy to purge herself of the contempt.").

sentence of imprisonment as a civil contempt sanction. Instead, we construe the

Supreme Court's statements seemingly forbidding any conditions about future

conduct in contempt sanctions as specific to their context (child support cases

involving potential issues about ability to pay) and as focused on the prohibition

against compelling impossible acts.

Prior to the rendition of *Crandell*, this Court rejected an argument

that a family court erred in imposing a sanction of incarceration subject to a set

period of conditional discharge for civil contempt, noting prior precedent did not

forbid this practice:

> Finally, Nienaber argues the family court erred in
> imposing a period of conditional discharge in a civil
> contempt case. Again, Nienaber cites *Ivy* in support of
> her argument. *Ivy* held that the family court erred in
> holding the obligor in contempt because she lacked the
> ability to pay her child support and never reached the
> issue of sanctions. Therefore, *Ivy* does not support
> Nienaber's argument, and she cites no other pertinent
> authority. Furthermore, in *Schaffeld v. Commonwealth
> ex rel. Schaffeld*, 368 S.W.3d 129 (Ky. App. 2012) and
> *C.C. v. Commonwealth ex rel. S.B.*, 568 S.W.3d 878 (Ky.
> App. 2019), the obligor's jail time in each contempt case
> was conditionally discharged, and this Court did not
> condemn the practice. As such, we cannot hold that the
> family court abused its discretion in imposing a period of
> conditional discharge in this case.

*Nienaber v. Commonwealth ex rel. Mercer*, 594 S.W.3d 232, 237 (Ky. App. 2020)

(hereinafter "*Nienaber*"). We note *Schaffeld*, 368 S.W.3d 129, and *C.C.*, 568

S.W.3d 878, were both appeals from revocation of conditional discharge imposed

as contempt sanctions for failure to pay court-ordered child support obligations. We reversed the revocation in *Schaffeld* due to the family court's failure to make specific findings about whether Schaffeld attempted to make bona fide payments of support but was unable to do so for reasons beyond his control or whether his previous non-compliance with a court order was willful. 368 S.W.3d at 135. Yet in both *Schaffeld* and *C.C.*, this Court did not identify the imposition of conditional discharge itself as a problem.

Despite citing *Schaffeld* and *C.C.* as authority supporting the use of conditional discharge as a contempt sanction, we reversed the contempt order in *Nienaber.* We explained:

> Based on the family court's findings, we must reverse the order of contempt. The family court clearly found Nienaber was unable to pay the purge amount. The court seemingly set an unattainable purge amount to ensure Nienaber would be discharged on the condition that she complete inpatient treatment, obtain employment as soon as permitted by her treatment program, and stay current on child support payments thereafter. Although we understand the family court's hope that Nienaber would successfully complete substance abuse treatment, she was required to complete the program as a condition of her parole in another case. The family court abused its discretion in setting the purge amount as the court found it was impossible for Nienaber to pay it.

594 S.W.3d at 236. Essentially, the contempt order was reversed in *Nienaber* because it was impossible for Nienaber to pay the amount to purge her contempt.

Somewhat similarly, our Supreme Court more recently reversed the contempt sanction (though not the finding of contempt) in *Crandell* on impossibility grounds since the sanction imposed could result in Crandell's imprisonment for future failure to pay court-ordered amounts for child support which he would likely lack the resources to pay. 642 S.W.3d at 691-92.

Similarly, our Supreme Court stated in *Ivy*: "the court should be mindful of the contemnor's overriding interest in not being required to perform an impossible act." 353 S.W.3d at 335. Despite the clear prohibition against a court's compelling a party to perform an impossible act, we are aware of no authority prohibiting a court from using its contempt powers to compel the doing of a **possible** act.

While obviously focused on issues about ability to pay in child support contempt cases and the impropriety of using contempt sanctions to order an impossible act in *Crandell*, our Supreme Court also more generally stated that the family court abused its discretion by issuing a contempt sanction which "seeks to punish future contempt rather than present contempt[.]" 642 S.W.3d at 688. *See also id*. at 692 ("Because the family court sought to coercively punish Crandell's future conduct, the order was an abuse of discretion.").

In making these statements, did our Supreme Court mean to cast doubt on the validity of any period of conditionally discharged incarceration as a

civil contempt sanction?  After all, a period of such conditional discharge, by its nature, suggests that one may be subject to incarceration if he or she does not comply with the terms of the conditional discharge.  In other words, one's future conduct may affect whether one is later incarcerated for failure to comply with the terms of conditional discharge.

But is the possibility of incarceration for future conduct in civil contempt sanctions prohibited, where it is **possible** for the contemnor to comply with the terms of conditional discharge?  Obviously, Kentucky precedent forbids subjecting parents to incarceration for failure to pay court-ordered child support if this failure stems from inability to pay.  *See, e.g.*, *Ivy*, *Crandell*, *Nienaber*.  But courts also have a duty to protect children.  *See Morris v. Morris*, 439 S.W.2d 317, 318 (Ky. 1969) (in child custody appeal, stating:  "We are not unmindful of our rule that the paramount consideration is the welfare of the children.  The court continues to be the protector of the children with power to act in the future for their protection.") (citations omitted).  *See also* KRS 620.010 ("Children have certain fundamental rights which must be protected and preserved, including but not limited to, . . . the right to develop physically, mentally, and emotionally to their potential; and the right to educational instruction[.]").

Moreover, our Supreme Court indicated that it was only following prior precedent including *Ivy* in *Crandell*.  *See generally* 642 S.W.3d at 690-91.

*Ivy* expressly notes that a court may use civil contempt sanctions to compel compliance with its orders. 353 S.W.3d at 334. And it further states that such coercive sanctions for civil contempt may properly include periods of incarceration imposed until the contempt is purged by compliance so long as the court does not require the performing of an impossible act:

> Coercive sanctions, such as daily fines or incarceration, are punishments imposed until the contempt is purged by compliance with an order. For the punishment to retain its civil character, the contemnor must, at the time the sanction is imposed, have the ability to purge the contempt by compliance and either avert the punishment or at any time bring it to an end. The contemnor bears the burden of proving his or her inability to meet the purge condition, but in imposing that burden the court should be mindful of the contemnor's overriding interest in not being required to perform an impossible act.

*Id.* at 334-35 (citations omitted).

Parents had the burden to prove their inability to purge their contempt. *Id.* at 335. But they have pointed to no evidence showing it is impossible for them to send their minor children to attend school; they have not even clearly asserted they could not do so. The family court found they had the present ability to send the children to school and it stated they can avoid incarceration simply by sending the children to school and providing appropriate documentation.

Far from threatening a parent with incarceration for future failure to pay financial obligations which the parent may lack the ability to pay, the family

-27-

court allowed Parents to purge themselves of contempt simply by sending their children to school and providing documentation of the children's school attendance. Surely, a family court has the power and duty to enforce its orders to make sure that the children it found to be educationally neglected attend school—especially when this does not require any financial outlay by the parents and when there is no evidence that it is impossible for the parents to send their children to school. Also, this case is distinct from *Crandell*, which contains language which Parents suggest forbids any conditions related to future conduct in contempt sanctions. Unlike Crandell (who offered some evidence of inability to pay child support and for whom the threat of incarceration had no termination date), Parents have pointed to no evidence that they would lack the ability to send their minor children to school for the two-year conditional discharge period.

Moreover, despite Parents' contention that the family court improperly sought to punish future conduct and/or future contempt violations, the family court stated its motivation for the sanction was to compel Parents to comply with its orders to send the children to in-person school. Moreover, despite the possibility of incarceration for any further non-compliance with the family court's orders for the children to attend school in person, Parents had the key to their own jail door and could avoid incarceration entirely by making sure that their minor

children attend school daily unless medically excused and providing quarterly documentation of school attendance. *See, e.g.*, *Nienaber*, 594 S.W.3d at 236.

In sum, despite Parents' contentions that the contempt sanction was punitive or criminal in nature, the family court fashioned a proper civil contempt sanction to compel compliance with its orders in accordance with Kentucky law.

Despite Parents' arguments to the contrary, the contempt sanction imposed here was clearly aimed at coercing compliance with court orders for the children to attend school in person and not obviously aimed at punishing past failure to comply with court orders. Had the family court wished to punish Parents for past instances of contempt, it could have imposed a non-conditional term of imprisonment or fee assuming it made a proper supported finding of criminal contempt and complied with procedural requirements for doing so. *See Blakeman v. Schneider*, 864 S.W.2d 903, 906 (Ky. 1993) ("The conditional nature of sentences renders actions to be civil contempt proceedings for which indictment and jury trial are not constitutionally required. . . . If the contemnor absolutely has no opportunity to purge himself of contempt, then such imprisonment can be deemed punitive in nature and in the nature of a proceeding for criminal contempt."). However, the family court did not find Parents in criminal contempt and the civil contempt sanction it imposed is not legally invalid.

Parents are not subject to incarceration based on failure to pay any amount—the family court did not order them to pay anything. *Compare Crandell*, *Ivy*, *Nienaber*. Nor have Parents even claimed that it is impossible for them to comply with the specific conditions set forth in the contempt sanction order—simply sending their minor children to in-person school and providing documentation of school attendance quarterly.

Moreover, Parents had counsel at all relevant times—unlike the parent found in contempt for failure to comply with parenting time orders and subjected to incarceration conditionally discharged upon future compliance with court orders in our unpublished, non-binding *Armstead* opinion.[13]

At most, the contempt sanction order was perhaps problematic in not expressly stating that Parents were entitled to notice, a hearing, and findings about their ability to comply should any future violations of their conditional discharge be alleged. *See Crandell*, 642 S.W.3d at 691 ("Just as in *Ivy*, here, Crandell should have been 'entitled to notice, a new hearing, and a finding that at [the future points] in time, [he] had the ability to comply' for each new finding of future contempt."). *See also Ivy*, 353 S.W.3d at 335 ("If Ivy did fail to pay, she would be entitled to

---

[13] *Armstead*, 2024 WL 3075029, at *1-2, 4.

notice, a new hearing, and a finding that at that future point in time she had the ability to comply.").

Although this case does not involve issues about ability to pay, perhaps some future conditions beyond their control might make it impossible for Parents to comply with the family court's orders to send their minor children to school. So, pursuant to *Crandell* and *Ivy*, the sanction order should explicitly state that Parents are entitled to notice, a hearing, and findings on their ability to comply to make sure their conditional discharge is not revoked for failure to perform an impossible act or without due process.

Though we otherwise affirm the sanction imposed as well as the contempt finding, in an abundance of caution, we remand the case to the family court to amend its contempt sanction order to explicitly provide that Parents are entitled to notice, a hearing, and findings on their ability to comply prior to any revocation of conditional discharge.

Further arguments in the parties' briefs which are not discussed herein have been determined to lack merit or relevancy to our resolution of this appeal.

**CONCLUSION**

For the foregoing reasons, we **AFFIRM** and **REMAND** the case for entry of an amended contempt sanctions order explicitly stating that Parents have a

right to notice, a hearing, and findings on their ability to comply prior to any

revocation of conditional discharge.

ALL CONCUR.

BRIEFS FOR APPELLANTS:

Jason A. Bowman
Louisville, Kentucky

BRIEF FOR APPELLEE
COMMONWEALTH OF
KENTUCKY, CABINET FOR
HEALTH AND FAMILY
SERVICES:

Michael J. O'Connell
Jefferson County Attorney

David A. Sexton
Assistant Jefferson County Attorney
Louisville, Kentucky